(No. 12216.—Judgment affirmed.)

THE CITY OF CHICAGO, Appellee, vs. ARTHUR L. FARWELL
et al.—(THE CHICAGO DOCK AND CANAL COMPANY,
Appellant.)

*Opinion filed October 21, 1918.*

1. SPECIAL ASSESSMENTS—*a witness need not be able to specify separate amount each element will benefit property.* In a special assessment proceeding the question is whether the whole effect of the construction of the improvement is an increase in the market value of the property, and an objection that a witness is not able to state the separate amount which each proper element will benefit the property does not go to the competency of his testimony but merely to the weight to be given to it.

2. SAME—*relief from traffic congestion is an element of benefit to industrial property.* Relief from traffic congestion by the widening of a street or adding a new roadway is a proper element of benefit to nearby industrial property, where such congestion has amounted to an obstruction to the proper transportation of goods to and from such property. (*Hohmann* v. *City of Chicago,* 140 Ill. 226, and *City of Chicago* v. *Spoor,* 190 id. 340, distinguished.)

3. SAME—*fact that property is not contiguous to street improved does not preclude assessment.* The fact that property assessed is not contiguous to the improvement is not material except upon the question of benefits, and if it actually receives a benefit from the improvement of such a character as to increase its market value it is properly assessed.

4. SAME—*what should be considered in determining benefit from a new highway.* In determining whether property will be benefited by the construction of a new highway the extent and use of the old and new highways and the probable effect of routes of travel of the new highway should be taken into consideration.

5. SAME—*it is not necessary that every part of the improvement shall be of benefit.* If property assessed is benefited by the construction of the whole improvement, the fact that some parts of the improvement may not be of benefit to such property does not authorize the deduction of the cost of such parts from the cost of the whole improvement with a proportionate reduction of the assessment against the particular property, if the benefit from the whole improvement equals the assessment, which is not more than the proportionate share the property should bear.

APPEAL from the County Court of Cook county; the Hon. WILLIAM L. POND, Judge, presiding.

WILSON, MOORE & MCILVAINE, (N. G. MOORE, of counsel,) for appellant.

WILLIAM J. DONLIN, (SAMUEL A. ETTELSON, Corporation Counsel, and EUGENE H. DUPEE, of counsel,) for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

This appeal is from a judgment of the county court of Cook county confirming a special assessment of $177,059.28 against the property of the Chicago Dock and Canal Company for the improvement of a thoroughfare from the north curb line of East Randolph street to the center line of East Chicago avenue. The only questions argued are those which concern the amount of benefit to the property, the appellant insisting that none of its property will receive any benefit from the improvement and that the court erred in its rulings on the admission of evidence and on findings of facts and propositions of law submitted by the appellant.

The ordinance for the improvement provided for widening Michigan avenue from Randolph street to the Chicago river by adding 61 feet to its east side for the construction of a bridge over the river, for the extension of the street from the river north over private property to Pine street, and for the widening of Pine street from this point to Chicago avenue by adding 75 feet to its west side. The thoroughfare, when completed in accordance with the ordinance, will comprise two levels, the upper rising from Randolph street to a height sufficient to furnish a clearance of 13½ feet for the lower level, crossing the river on the upper level of the bridge and descending to the surface of the ground at Ohio street, somewhat more than half a mile north of Randolph street, crossing in its course Lake street, South Water street and River street south of the river

and North Water street, Austin avenue, Illinois street and Grand avenue north of the river, though it will have no connection with any of these streets except Lake street. The lower level will extend from Lake street across the river on the lower level of the bridge to Grand avenue and connect with the intersecting streets. The roadway of the upper level will be paved throughout its length with asphalt, that of the lower level with granite blocks except south of South Water street, where concrete will be used, and the lower level of the bridge, which will be paved with creosoted wooden blocks. Michigan avenue is now connected with the north side of the river by the Rush street bridge, the south end of which is about 50 feet west of the south end of the proposed new bridge and the north end of which is about 250 feet west of the north end of the proposed new bridge. This bridge connects at the north end with Rush street, which extends north 300 feet west of Pine street. It has one level, only, and is to be removed.

The appellant, the Chicago Dock and Canal Company, is the owner of a large number of lots lying north of the Chicago river and east of Pine street. With the exception of several disconnected lots they constitute a tract of about fifty acres of irregular shape, extending east from St. Clair street nearly half a mile, bordering on the river and lake on the south and east and Grand avenue on the north. St. Clair street is the first street east of Pine street, from which its distance is 300 feet. North Water street and Illinois street run clear through the tract from west to east and are paved with granite blocks, as is Grand avenue. There are no north and south streets east of St. Clair street except Seneca street and Peshtigo court, which run from Illinois street to Grand avenue. A large canal slip runs through about the whole length of the premises between Water street and Illinois street and is used by vessels coming into Chicago harbor. A track of the Chicago and Northwestern railway enters the premises along North

Water street and by means of numerous switch tracks connects with nearly every parcel of the premises. The character of all the property is industrial, and the highest and best uses of which it is or in the future will be capable are for industrial and wholesale purposes. Half of it is now permanently improved for such purposes with substantial buildings, some of them very large and expensive.

The Rush street bridge has two roadways, each 17 feet wide, and is about six feet above the level of Rush street and Michigan avenue. The roadway of Rush street is 38 feet wide. The lower level of the new bridge will have two roadways, each 17½ feet wide, and will be about the same distance above the connecting streets as the Rush street bridge. The lower level of Michigan avenue will be substantially the same as it now is except that it will be 61 feet wider, and the lower level of Pine street and its extension to the river will be substantially the same as it now is except that it will be 75 feet wider. The intersecting streets will cross the lower level at their present grades except Grand avenue, which, on account of the approach of the upper level to the surface, must be depressed about five feet to give the necessary clearance to the lower level. For the same reason the lower level inclines downward from Illinois street to Grand avenue.

The cost of the work, aside from the compensation for land taken or damaged, is $2,298,247, of which the cost of the bridge is $980,965. The compensation to be paid for land taken or damaged is $4,964,288, making the total cost of the improvement $7,262,535. In the assessment roll filed, $4,357,521 of this amount was assessed against private property specially benefited and $2,905,014 against the city for public benefits. The court re-cast the assessment roll and amended it on its face by reducing the assessment on each parcel of private property twenty per cent and adding that amount to the public benefits, thus increasing the latter to $3,776,518.80 and reducing the benefits to private

property to $3,486,016.20. Thereupon all legal objections were withdrawn, those remaining only as to which the objectors were entitled to a trial by jury.

The foundation of the claim that the appellant's property will be benefited by the improvement is the additional facilities for commercial traffic which it is insisted will be afforded beyond those which it now has. Facilities for the transportation of goods to and from the warehouses and industrial plants which occupy the appellant's property are essential to the conduct of their business and to the value of the property for industrial purposes. These goods are transported by rail, by water and by vehicles upon the streets. About half of the transportation to and from this property is by vehicles either along and upon Rush street or crossing it, and about half of this transportation by vehicles crosses the Rush street bridge. Much evidence was introduced for the purpose of showing the adequacy or inadequacy of Rush street, the bridge and the streets south of it to accommodate the traffic passing over them. Rush street, including the bridge, is now the main channel for a considerable part of the transportation to and from the appellant's property. It is also a very important channel of communication between a great part of the city of Chicago lying north of the Chicago river and the business district on the south. There lines of commercial traffic concentrate coming from the territory north of the river into Rush street from the east and from the west by the various cross-streets and going to the railroad terminals and wholesale merchants on the south side, and similar lines moving in the opposite direction also concentrate there, and these are all crossed by lines of east and west travel between the railroad terminals and industrial plants, warehouses and merchants. Besides the commercial traffic there is a much greater amount of automobile traffic north and south over the bridges from the north to the south side of the Chicago river, three-fourths of which goes over the Rush street

bridge, which has nineteen per cent of the total bridge road-way between the north and south sides. The new bridge, with its two levels, will have thirty-eight per cent of the bridge roadway between the two sides. While the ordinance does not require it, the expectation is that the automobiles and other vehicles not engaged in heavy commercial trans-portation will use the upper level of the street and the heavy and slower commercial vehicles will use the lower level. The latter will thus be relieved of three-fourths of the ve-hicles using it, and the commercial vehicles will have the use of the whole of both roadways free from any inter-ference on account of the other traffic. Each of the road-ways on the Rush street bridge has two lines of travel, and into these four lines,—two moving in each direction,—the streams of vehicles coming from every direction concen-trate. These commercial vehicles constitute only about one-fourth in number of the vehicles crossing the bridge. The other three-fourths consist of ordinary automobiles as dis-tinguished from commercial vehicles. Traffic policemen at either end of the bridge regulate the traffic, separating, so far as possible, the heavy commercial vehicles and slow teams from the more rapidly moving vehicles, the former using the outside of each roadway and the latter the inner lines. North and south of the bridge,—for the reason that heavy vehicles are usually backed up to the curb on both sides, cutting down the space for moving vehicles,—these four lines ordinarily merge into three, two moving in the direction in which most of the traffic is going at the par-ticular time and one in the opposite direction. Witnesses testified, from actual observation and count, in regard to the number and kind of vehicles and their loads crossing the bridge between certain hours of the day and each hour of the day on many different days; to all the interruptions to traffic at each of the street intersections of Michigan ave-nue and Rush street from Randolph street to Grand avenue, caused by the meeting lines of vehicles; to the number of

vehicles entering and leaving the street and their places of entrance and departure; to the length of time taken by vehicles to pass a given point; to the computation of the number of vehicles which could cross the bridge in an hour; to a comparison of the capacity of the bridge thus arrived at with the number which actually did cross; to the existence of vacant places in the traffic and their extent, and to a great many observations in connection with vehicle traffic throughout the central business district of the city, and many tabulations and diagrams were introduced in evidence to illustrate these matters and the condition, generally, of the traffic to, .from and within the central business district. There was evidence that there is a great congestion of traffic on the Rush street bridge caused by the great automobile traffic, particularly from 8 to 10:30 in the morning and from 4:30 to 6:30 in the evening, when that traffic is heaviest. There was also testimony that very little delay of teams or commercial vehicles was caused by congestion of traffic on Rush street or at the bridge, and that such delay as occurred was so slight that the removal of it would be of no pecuniary value.

From a consideration of all the evidence the court was justified in finding that the thoroughfare between the north and south sides of the city, consisting of Michigan avenue and Rush street connected by the Rush street bridge, was not adequate at all times for the traffic upon it; that the congestion of vehicles by reason of its insufficiency caused obstruction of every kind of traffic, to great public inconvenience; that the cause of the greatest congestion was the use of the thoroughfare at certain hours of the day by many automobiles other than commercial vehicles engaged in the hauling of freight or other heavy loads, such automobiles moving much more swiftly than the commercial vehicles and constituting three-fourths of the traffic in numbers, and that the doubling of the capacity of the thoroughfare by widening the streets and adding the upper roadway would furnish

284 – 32

accommodation for all kinds of traffic adequate to the present or anticipated public requirements. As to the effect upon the value of the appellant's property the divergence in the testimony of the witnesses for the appellant and the appellee was as remote as possible, the appellee's witnesses estimating the increase in value by reason of the improvement at much more than the assessment, while the appellant's denied there would be any increase. On either side they were men of many years' experience in the real estate business in Chicago, familiar with values, accustomed to making valuations of property, and observing and judging of the effect on the value of property of public improvements affecting them. They gave their views and the reasons for their opinions in detail. The judgment is sustained by the evidence if in reaching it the rules of law were given their proper application.

The opinions of the witnesses who testified to an increased value of the appellant's property caused by the improvement were based to a great extent upon the advantages arising from the relief of the congestion on Rush street and the bridge by the transfer of the automobile travel to the upper level of the improvement. The widening of the roadway, the closer proximity of Pine street than of Rush street to the property, the straightening of the roadway and the shortening of distance and time from the property to the center of the city, were also elements which the witnesses testified were taken into consideration in determining the increase in value of the property. Some or all of them testified substantially that while they had taken all these things into consideration as a whole they had not put a value on them as separate elements, and some of them said they would not be able to do that. The appellant made a motion to strike out the testimony of these witnesses in respect to advantages and benefits flowing from the relief of congestion because it involved an illegal element. It is insisted that the advantages supposed to be derived from

the relief of congestion is not a proper element for consideration in estimating the benefits, and that the court erred in not excluding the opinions of witnesses based upon the consideration of those advantages. It is not necessary that a witness testifying to benefits accruing to property from a public improvement and stating several causes of such benefits should be able to divide the increase and state the amount accruing from each cause separately. The question is whether the whole effect of the construction of the improvement is an increase in the market value of the property. A witness may be cross-examined in regard to the basis of his opinion as to the amount of such increase, but an objection that he is unable to separate the aggregate and state the precise sum which each element of advantage contributed to the total goes to the weight of his opinion and not to his competency. (*Geohegan* v. *Union Elevated Railroad Co.* 266 Ill. 482.) If the witness has based his opinion in a material degree upon elements of advantage which cannot be legally considered and which he cannot or will not separate from the causes which may be legally considered, such opinion is not competent. *City of Kankakee* v. *Illinois Central Railroad Co.* 264 Ill. 69.

The appellant's objection is that the relief of traffic congestion, upon which to a large extent the appellee's witnesses based their estimate of benefits, cannot legally be the basis of such an estimate. It is argued that the elements of benefit which will support a special assessment must be of the same character as the elements of damage against which it may be set off, and the cases of *Hohmann* v. *City of Chicago,* 140 Ill. 226, and *City of Chicago* v. *Spoor,* 190 id. 340, are cited, holding that the construction of a viaduct whereby the general travel of the public past the plaintiffs' premises on the street was diminished was not an element of damage for which the plaintiffs could recover. The argument does not apply here. In those cases there was no question of an interference with business by the cutting off

of access to the premises. It was only the general travel of the public on the street which was affected, in which the plaintiffs had no legal interest. The benefit which is claimed to be derived by the appellant's property here will not be affected by the general travel on the street. What will affect this property is the furnishing a new street to it and the removal of an obstruction to traffic. If the Rush street bridge were destroyed and no other were built instead of it the business conducted on the appellant's property would suffer serious inconvenience and loss entirely distinct from the inconvenience and loss of the general public. If, then, a street were constructed directly from the appellant's property across the river the appellant's property would have a benefit and advantage entirely distinct from the benefit and advantage of the public or other property. Accessibility is an essential element in the value of industrial property. Access to public highways adequate to furnish convenient facilities for transportation is necessary. If one street is inadequate to furnish the facility of transportation required, the enlargement of the street or the construction of a new street which increases the highways conveniently available for the required transportation is of value to the property for which transportation is required. Adequacy of transportation concerns not merely commercial transportation. Pleasure vehicles and vehicles engaged in other business than heavy transportation have the same right to use the street as vehicles engaged in the transportation of heavy articles of commerce or other goods. If a street which all classes of vehicles may use and do use is inadequate to furnish proper facilities for passage to all classes when they desire to use it, then all classes of vehicles which use the street contribute to the result. It cannot be said that the automobiles, alone, are responsible for the congestion of traffic because if no automobiles used the street there would be no congestion of other vehicles, any more than the commercial traffic can be held responsible for all the congestion because

if its vehicles were kept off the street there would be no congestion. The removal of either would remove the congestion, but the property having the benefit of the use of the street for commercial traffic, which with one-fourth of the vehicles uses one-half of the space, cannot rightfully claim to be relieved of any participation in the cost of the improvement of the street because without the automobile traffic there would be no congestion.

The fact that the appellant's property is not contiguous to Rush street or the bridge, and will not be to the proposed improvement, is not material except as to the amount of benefit. If it does actually receive some benefit from the improvement of such a character as to increase its market value it is properly assessed.

The appellant submitted to the court certain findings of fact, and it is insisted that the refusal of the court to hold them was error. The first was that none of the parcels of land would be benefited, covering the whole case. The second stated that the highest and best use of the appellant's property was for warehouse or industrial uses requiring transportation by roadway and bridge only for carrying merchandise and would so continue after the improvement, and that the facilities for such uses would not be enlarged by the improvement except to the extent that appellant will participate with other property, in and out of the assessed district, in whatever relief may result to such transportation by the voluntary use by vehicles of the additional roadway facilities furnished by the improvement. One objection to this finding is that it ignores the power of the city to regulate the use of the roadways by different classes of vehicles. Though this power has not been exercised in the ordinance for the improvement, it cannot be said, so long as the city has the power, that the relief to transportation is confined to the voluntary acts of those using the roadways. Moreover, in establishing new highways the extent of the use of old and new highways and

the probable effect upon routes of travel of the new highways not only may be, but should be, taken into consideration in determining the effect upon property affected by the change.

The third proposed finding is immaterial, because, after stating that a large part of the benefit of the proposed improvement is that which will result from affording a more desirable thoroughfare for the use of passenger automobile traffic, thereby reducing the interference of such traffic with commercial traffic, it concludes, "and, as the evidence also shows, others using said streets and bridge for like purposes will share said advantages with the occupants of said objecting property." It was not claimed by the appellee that the appellant's property, alone, would enjoy these advantages, but large sums were assessed on other property for its share in the enjoyment of them and more than half of the whole cost of the improvement on the city for the share of the general public in such enjoyment.

The fifth proposed finding of fact was a proposition of law based on the statement that the appellant's property would get no benefit from the improvement which it would not get from a smaller improvement involving no greater width than the present width of the highways with which it is to be connected, and therefore requiring no condemnation of land for widening or any other purpose than sufficient to extend Pine street to the river. The proposition of law was that to find the true amount of benefits, the cost of acquiring the land (except for the extension of Pine street to the river) should be deducted from the total cost of the improvement and the assessment on each parcel of appellant's property reduced proportionately. This was erroneous. The cost of the whole improvement was properly assessed against all the property benefited by the improvement in proportion to the benefit. The fact that some part of the improvement by itself would not benefit a particular parcel of property was no reason for reducing

the assessment of that parcel if the effect of the whole improvement was to add to the value of that parcel an amount equal to the assessment and the assessment was not more than that parcel's proportionate share. There was no evidence on the question of the appellant's proportional share of this assessment, for it took the position that its property was not benefited in any amount. The fact that certain parts of the improvement, only, were beneficial to the appellant's property and that other parts were of no benefit to it was necessarily taken into consideration in determining the extent of the benefit to the appellant's property, but only one improvement is involved though consisting of several parts, and the object of the proceeding is to assess the whole cost of the entire improvement upon all the property benefited by it, including every feature of it. The benefit derived from any part of the improvement must be assessed against the property receiving it and must be considered as arising from the whole improvement, but the assessment cannot exceed the amount of the benefit or the proportional amount of the whole assessment which the particular property should bear. If because the benefit is derived from some particular element of the improvement the benefit is less or greater, that fact must be considered in determining the proportional amount the property should bear, but the proportion must be arrived at by comparison with the cost of the whole improvement and not by comparison with the cost of special parts of the improvement regarded as if they were separate improvements.

What has already been said disposes of the appellant's objections to the refusal of its propositions of law. Some of the refused propositions stated that any benefit to the appellant's property by the removal to the new highway of a part of the traffic using the same roadway as the traffic teams to and from the appellant's property, and any relief from congestion of traffic by the furnishing of another attractive and convenient highway or by the removal of

traffic dependent upon the voluntary choice of persons using vehicles other than those engaged in commercial transportation to use the more convenient and attractive highway to be furnished by the improvement, could not be assessed against the appellant's property. Other propositions stated that if the appellant's property was benefited only by some particular part or element of the improvement, then in determining the amount of the assessment on the appellant's property the cost of all other parts or elements of the improvement which were of no benefit to the appellant's property should be eliminated and only the proportionate amount of those parts of the improvement which benefited appellant's property should be assessed against it. These propositions were all properly refused.

The judgment is affirmed.          *Judgment affirmed.*