82 Ill. App.3d 312 (1980)
402 N.E.2d 773
THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,
v.
GEORGE CONNORS, Defendant-Appellant.
No. 78-2079.
Illinois Appellate Court  First District (2nd Division).
Opinion filed March 18, 1980.
*313 Ralph Ruebner and Alan D. Goldberg, both of State Appellate Defender's Office, of Chicago, for appellant.
Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, James S. Veldman, and Robert J. Clifford, Assistant State's Attorneys, of counsel), for the People.
Reversed and remanded.
Mr. JUSTICE STAMOS delivered the opinion of the court:
Following a jury trial, defendant, George Peter Connors, was found guilty of the armed robbery of Alonzo Weems and sentenced to 6 to 12 years in the penitentiary. On appeal defendant raises three points of error in the trial court proceedings and contends that each was sufficiently prejudicial to mandate the reversal of his conviction. He first objects to the admission of evidence concerning a second robbery, perpetrated earlier the same day as the crime for which he was tried here. On this same issue, he asserts that a jury instruction which failed to limit the jury's considerations of the other offense compounded the error. He also claims two instances of reversible error in regard to the comments of the prosecutor during closing arguments: first, when the prosecutor suggested to the jury that they could draw the proper conclusion from matters excluded under the rules of evidence; and second, when the prosecutor commented on the defendant's failure to testify.
On January 18, 1977, at about 11:35 p.m., Alonzo Weems was in the 100 block of North Lotus, stepping from his car, when he was approached by a man wearing a greyish wool cap and dark jacket and holding a small caliber blue or black automatic gun. The man approached Weems and stated "don't make me shoot you."
*314 Weems testified that the lighting was good, and the robber, whom Weems identified as defendant both at a lineup prior to trial and later in court during the trial, faced him for 15 to 20 seconds. Weems stated that he tried to walk away but defendant grabbed his arm and forced him into the rear of a gangway between two houses. Defendant asked Weems where his money was. When Weems replied that it was in his coat pocket, defendant took the money and asked that the coat, gloves and jewelry also be removed. After telling Weems not to look back, defendant gathered these items and a wallet and ran toward the street. The whole incident encompassed about 1 1/2 to 2 minutes.
Weems described the coat as three-quarter length, red leather with four pockets, and containing a tag that said tailored for Alonzo Weems. The wallet was also distinctive with the words G and G Production printed on it in gold. He described the robber as 5'10" to 5'10 1/2" tall, and about 145-150 pounds. Weems also testified that as the first man approached the car, Weems saw another man about 20 to 25 feet away. The individual never came any closer, however, and Weems was unable to identify him any more specifically than that he was about 6' tall.
On cross-examination, Weems stated that the first robber was 5'7" to 5'8" tall. He did not remember what kind of car he was driving or specifically where in the city he had been for the three hours prior to the robbery since he had been lost.
At this point in the trial, following Weems' testimony and before police witnesses were called, the defense made a motion in limine, objecting, as it had during opening statements, to the introduction of testimony concerning a crime other than the one for which defendant was on trial. During his opening statement, the assistant State's Attorney had commented in relation to expected testimony by the police officers:
"[T]hey will also tell you that they were in the area in the first place for an armed robbery that had occurred at about 7:30 that evening or about four hours before this one and they were looking for a specific car that was taken and that [sic] 7:30 armed robbery that car being a '65 Oldsmobile with a certain license number 76 Illinois  JE 8957 I think was the number."
As these statements were made, the defense objected and, when the objection was overruled, made an offer of proof. The defense argued that the automobile robbery was unrelated to the robbery of Alonzo Weems. The court asked the assistant State's Attorney the basis for the introduction of the evidence. He responded that it was incident to the arrest and that it indicated a plan, propensity, or identification of the offender. The trial court then overruled the defense objection.
The second objection to this evidence occurred immediately prior to the testimony of the second prosecution witness, Officer Cannon. This *315 motion in limine focused on the improper use of a police officer to establish by hearsay defendant's commission of another crime. Defense counsel reiterated that although the door had been opened to such evidence because of the prosecutor's opening statement (and presumably the court's rulings on such evidence), if the State was going to use the prior crime to establish motive, intent, or whatever, the specific act would need to be proved by competent evidence. The defense also repeated its assertion that the prior crime was irrelevant to the issues in this case and the prejudice to defendant far outweighed any probative value it might have. The court ruled that the fact that the car was stolen had to be established by direct testimony but that "If they say, reported to have been stolen so that explains the reason why [the police officers] are viewing the defendant, I'll permit that  because I think that is probably admissible."
Officer Cannon testified that on the day of the robbery, he and his partner went to the area of 165 N. Pine because they heard a radio call of the Weems robbery, which had just occurred at 122 North Lotus. They observed a black or brown Oldsmobile parked on the corner of Pine and West End, about a half block from the North Lotus location. Two male Negroes exited the car, passing through the headlights of the police vehicle. The officer recognized one as a man known as "Pete" and saw that he was carrying a red leather coat over his arm and had a cream colored knit cap on his head. As they drove past the Oldsmobile the officer noticed that it fit the description of an automobile stolen in a robbery earlier in the day. Defense counsel objected and, after being sustained, moved at sidebar for a mistrial. This motion was denied. The prosecutor renewed his questioning: "the vehicle in question was reported stolen in an earlier armed robbery, is that not correct?" Once again, an objection was raised and sustained; a motion for a mistrial was again made. The court stated that it would hold the motion in abeyance until the State put on direct, admissible evidence tending to show modus operandi.
Following the sidebar, the prosecution once again asked about the automobile. The officer responded that he had noticed the vehicle because of a radio message earlier that day. Once again, an objection was raised and overruled. Officer Cannon testified that the license number was verified as that of the stolen car. Backup cars were requested. A description also came over the radio of the two robbers of Alonzo Weems; five foot seven or eight inches tall, male Negroes, dark clothing, with one of the men wearing a light colored skull cap. The items taken from Weems were also described.
Officer Cannon saw the two men enter an apartment building across from the car and emerge from it about 10 minutes later. When the men *316 returned to the vehicle, now verified as stolen, the officers converged on car. Defendant left the automobile and started towards the building, but was immediately arrested. Officer Cannon then went to the apartment building, which was approximately seven stories with 40 apartments on each floor. Both officers proceeded to an apartment on the second floor and were allowed to enter after they told the man who opened the door that they were investigating a robbery. A red leather coat was found in the apartment with a .25 automatic in the right front pocket. A wallet with Alonzo Weems' identification in it was also discovered.
Officer Hoffman, Cannon's partner on the night in question, testified next. His testimony substantially mirrored that of Cannon, but he added that he took the other man in the car with defendant into custody. Hoffman had a conversation with the second suspect, Williams: "I asked him where he just come from and where the coat had been taken to." The assistant State's Attorney then asked, "Officer, did the man you're talking about as Mr. Williams answer that question, just tell me, yes, or no?" Hoffman answered, "Yes sir," and the assistant State's Attorney continued, "Based on the answer you gave me to that question where, if anywhere, did your partner go?" Hoffman answered: "Room 207."
Cleveland Carr was called next by the prosecution. He testified that on January 18, 1977 (the same day as the Weems robbery), at 7:15 p.m., he was getting into his car, a 1965 Olds, at 22 South Cicero, when a man stuck a gun in his back. The robber told Carr to lie down in the snow. Carr identified defendant as the robber and stated that another man was also present. Carr stated defendant informed him that if he moved, he would be shot; both robbers then drove away in Carr's vehicle. Following the prosecution's direct examination, defense counsel stated that pursuant to prior objections, there would be no question at that time.
Following a stipulation of defendant's age (28 at the time of trial), the State rested. The defense called its only witness, Officer Stanley Pasko. Pasko was one of the officers who responded to the Weems incident. He testified to the description in the police report: male, Negro, 20 to 25 years old, 5'7" and 145 pounds. The defense then rested.
Both sides agreed to the jury instructions. Closing arguments were presented. During the course of his argument the assistant State's Attorney commented:
"Officer Hofmann went on to state that he then asked that individual he was talking to; Willie Williams, where the coat that George Connors was carrying, and Officer Hofmann stated that he responded to that question.
Immediately after responding to that question the Officer went to Apartment 207.

*317 Ladies and gentlemen, there are rules of evidence which prohibit us from introducing certain evidence.
MR. GERAGHTY: Objection.
THE COURT: Objection overruled. You may proceed.
MR. SCHLEE: We can only get in legitimate testimony. It is for you people to decide, for you people to draw the proper conclusion that may be drawn."
After reviewing the testimony of each state witness, including that pertaining to the stolen vehicle, the prosecutor asserted:
"We have heard further testimony from a person by the name of Cleveland Carr. Cleveland Carr testifies that yes, it was his car that was stolen at approximately 7:15 on that same evening, a 1965 four-door Oldsmobile, I believe he said, the same car Officer Cannon described as being the one that was taken in the armed robbery, and the reason they first drew attention to Mr. Connors. Ladies and gentlemen, the testimony of the people who have testified here is uncontroverted, uncontradicted. You have heard absolutely no one tell you anything else."
After arguments were completed, the jury was given instructions, among which was the following:
"Evidence has been received that the defendant has been involved in a crime other than that charged in the information. This evidence has been received solely on the issue of the defendant's identification, presence, intent, motive, design and knowledge. This evidence is to be considered by you only for the limited purposes for which it was received."
The jury found defendant guilty and his post-trial motion for a new trial was denied.
 1, 2 As a general rule evidence of extra-indictment offenses is inadmissible. Nevertheless, where such evidence is relevant to an issue in the case, tending to show motive, intent, identity, absence of mistake or modus operandi, it may be admissible. (People v. McDonald (1975), 62 Ill.2d 448, 455, 343 N.E.2d 489.) Where it is offered solely to show defendant's propensity to unlawful acts, however, it is sufficiently prejudicial to be considered reversible error. (People v. Gleason (1962), 36 Ill. App.2d 15, 183 N.E.2d 523.) In determining admissibility, the actual need for the evidence and its convincingness and strength is weighed against the "degree to which the jury will probably be roused by the evidence to overmastering hostility." (People v. Butler (1971), 133 Ill. App.2d 299, 302, 273 N.E.2d 37.) Resolution of the conflict thus depends on whether the evidence of another crime is so closely connected with the main issue that to establish the one tends to prove the accused guilty of *318 the crime for which he is being tried. People v. Whitley (1974), 18 Ill. App.3d 995, 1001, 311 N.E.2d 282.
 3 The State contends that evidence of the car theft was relevant and admissible on a number of grounds  identity, design, and proximity, but properly abandons the trial assistants' "propensity" argument. Identity was the key issue at defendant's armed robbery trial and common design or modus operandi, which the State attempted to show by Carr's testimony, was urged to enhance and substantiate Weems' identification. If these two crimes were indeed so identical as to "earmark" each as the crime of one man then the test of modus operandi was met and the evidence was properly admitted. (People v. Osborn (1977), 53 Ill. App.3d 312, 320, 368 N.E.2d 608, cert. denied (1978), 439 U.S. 837, 58 L.Ed.2d 134, 99 S.Ct. 122.) In Osborn, the defendant used the pretext of a newspaper "help wanted" ad to gain contact with each victim. He would contact the women ostensibly to employ them, but the relationship would soon take on social and personal implications. He would arrange interviews and consultations for the evening hours and would then use physical force to attempt sexual relations with the women, seizing each by the throat. Osborn held that similarities in the method of each incident established common design or modus operandi so that identification testimony of an earlier victim could be used in an unrelated trial. People v. Tranowski (1960), 20 Ill.2d 11, 169 N.E.2d 347, cert. denied (1960), 364 U.S. 923, 5 L.Ed.2d 262, 81 S.Ct. 290 (strikingly similar scheme or design in same place at same time); see also People v. Bennett, (1973), 9 Ill. App.3d 1021, 293 N.E.2d 687; People v. Lindren (1979), 79 Ill.2d 129.
In the instant case, the theft of Carr's vehicle occurred four hours and six blocks from the Weems robbery. The State has attempted to show on appeal, although not arguing such below, enough similarities in the two crimes to invoke the modus operandi exception. The similarities that both happened at night, with a gun, near the victim's car are insufficient to show modus operandi. Similarly the statements made to each of the victims  "Don't make me shoot you" and "if you move I'll shoot"  are common to crimes in general, and not so distinctive as to earmark each as the conduct of the same perpetrator.
The State has also argued that the car theft was accomplished to facilitate the Weems robbery and as such each crime was really part of one transaction and common plan. Disregarding for the moment the very real problem of passage of time (four hours between each crime), Weems was specifically asked at trial if he saw a car. He stated that he did not; he did see another man standing about 20 to 25 feet away. The concept of the getaway car that the State has advanced for the first time on appeal *319 has no support in the record, especially since defendants were arrested about one block from the Weems robbery.
Our supreme court in People v. Romero (1977), 66 Ill.2d 325, 362 N.E.2d 288, refused to create a new exception to the other crimes rule where the identification evidence merely served to enhance the credibility of the witness in the crime at issue. Although the State here has not urged enhancement as a rationale for the admission of Carr's testimony, in reality, such was the nature of his testimony. In Romero, as here, the trial court permitted police officers to testify to events which indicated that defendants were involved in other offenses. Romero held that where the other crime did not facilitate the crime at issue and the events relevant to the subject crime were not of themselves implausible without the details of the second crime, the testimony was inadmissible. (66 Ill.2d 325, 331-32; compare People v. Brown (1962), 26 Ill.2d 308, 186 N.E.2d 321.) Because there was not an affirmative showing of lack of prejudice in Romero, the supreme court remanded for a new trial. 66 Ill.2d 325, 332.
 4 It has repeatedly been held, in a variety of contexts, that "[u]nder our concepts of a fair and impartial criminal trial, it is elementary that a defendant, no matter how reprehensible his crime or how black his history of past misdeeds, is entitled to have his guilt or innocence determined solely with reference to the crime with which he is charged." (People v. Gregory (1961), 22 Ill.2d 601, 603, 177 N.E.2d 120; cf. People v. Curry (1975), 25 Ill. App.3d 637, 323 N.E.2d 778 (police testimony that defendant was recognized because of outstanding rape warrants unrelated to case at issue resulted in prejudicial picture of defendant); People v. Jenkins (1973), 10 Ill. App.3d 166, 294 N.E.2d 24 (police testimony that defendant was arrested for unrelated crime reversible error); see also People v. Williams (1966), 72 Ill. App.2d 96, 218 N.E.2d 771.) Accordingly, unless the evidence of the theft of Carr's vehicle was relevant to some issue other than defendant's propensity for criminal conduct, it should not have been allowed before the jury, particularly compounded as it was by the confusing, inexplicit jury instruction. In the case at bar, the jury was informed that the stolen car was the impetus for the defendant's arrest. It would have been sufficient for the officer to testify that he recognized "Pete" and soon thereafter received a description of the Weems robber which matched that of defendant. The details of the other crime and the absence of connecting facts which would bring it within one of the exceptions to the other crime rules made its introduction error. (People v. Butler (1971), 133 Ill. App.2d 299, 273 N.E.2d 37.) The jury instruction concerning such evidence, containing as it did all of the possible exceptions to the other crimes rule, magnified the *320 error. It did not serve to limit the jury's use of such evidence and failed to convey the proper emphasis of the instruction  that such prejudicial evidence was restricted in value. Although the instruction was not properly objected to prior to going to the jury, under Supreme Court Rule 451(c), we may consider it on appeal where the interests of justice demand. (Ill. Rev. Stat. 1977, ch. 110A, par. 451(c); People v. Jenkins (1977), 69 Ill.2d 61, 370 N.E.2d 532.) It must be stressed, however, that this is not a case where the instruction was merely improperly broad. (Compare People v. Weathers (1974), 23 Ill. App.3d 907, 320 N.E.2d 442, rev'd on other grounds (1975), 62 Ill.2d 114, 338 N.E.2d 880.) Instead, the instruction served to increase the prejudice resulting from the inflammatory admission of testimony concerning the armed robbery of Carr's vehicle. (See People v. Richards (1978), 64 Ill. App.3d 472, 474, 381 N.E.2d 307.) Thus, its use was error.
 5 The second and third issues raised by defendant relate to alleged prosecutorial misconduct. Defendant contends that his right to a fair trial was impinged by the prosecutor's comments on inadmissible evidence. It is well established that a prosecuting attorney may not comment on facts not in evidence, especially where those facts are inadmissible. (See People v. Donaldson (1956), 8 Ill.2d 510, 518, 134 N.E.2d 776.) The alleged prejudicial comments occurred during closing arguments when, in reviewing the evidence, the assistant State's Attorney noted that although the jury was not allowed to hear the co-arrestee Williams' response to Officer Hoffman's question because of the rules of evidence, they could infer its content. This comment, suggesting an open-ended inference, was highly improper. (See, e.g., People v. Burton (1978), 63 Ill. App.3d 915, 380 N.E.2d 929.) To suggest to a jury that they can not hear hearsay as evidence, but they can infer it for use against defendant, puts defendant in the difficult position of perhaps being better off to have allowed the hearsay in. (See also People v. Mwathery (1968), 103 Ill. App.2d 114, 122, 243 N.E.2d 429.) Further, the judge's overruling of the defense objection, and the prosecutor's continued reference to suppression under the rules of evidence, increased the prejudicial impact of the argument. See generally People v. Hovanec (1976), 40 Ill. App.3d 15, 351 N.E.2d 402; cf. Anderson v. Universal Delta (1967), 90 Ill. App.2d 105, 111, 234 N.E.2d 21 ("`it is error sufficient to reverse a judgment to permit counsel to state, against objection, matter not in evidence and pertinent to the issue or to assume arguendo facts to be proven when they are not'").
The State cites People v. Bracy (1973), 14 Ill. App.3d 495, 302 N.E.2d 747, for the proposition that although the prosecutor's assertion that he was precluded by the rules of evidence from introducing certain evidence was questionable, it was not reversible where the evidence was *321 overwhelmingly against the defendant. We would agree with this statement as a general proposition (see generally Chapman v. California (1966), 386 U.S. 18, 17 L.Ed.2d 705, 87 S.Ct. 824, but would note that in Bracy there are several distinguishing factors. First, there is no indication that an objection was made and overruled, in effect judicially validating the prosecutor's suggestions to the jury. (Compare People v. Sanders (1976), 37 Ill. App.3d 236, 240, 345 N.E.2d 757.) Further, and most importantly, the prosecutor's comments in Bracy were made during rebuttal, in direct response to defense counsel's argument. Additionally, the evidence referred to in Bracy was a paper bag containing the proceeds of the robbery about which testimonial evidence had already been heard. Here, in contrast, the prosecutor's comments concerned possible statements made by defendant's co-arrestee. The nature of the surrounding circumstances suggested an admission as to the location of the proceeds from the Weems robbery. Whether or not these comments, standing alone, were a material factor in defendant's conviction, they were clearly improper.
 6, 7 Defendant's final claim is that the prosecutor's references to the uncontradicted nature of the evidence was a comment on his failure to testify and thus reversible error under Griffin v. California (1965), 380 U.S. 609, 14 L.Ed.2d 106, 85 S.Ct. 1229. It is well established that the prosecutor may comment on the uncontradicted nature of the State's case, even when the only person who might have contradicted it was the defendant. (People v. Mills (1968), 40 Ill.2d 4, 237 N.E.2d 697.) Yet the State may not comment in a manner intended or calculated to direct the jury's attention to the defendant's neglect to exercise his right to testify. (People v. Burton (1969), 44 Ill.2d 53, 56, 254 N.E.2d 527; People v. Blissitt (1973), 12 Ill. App.3d 551, 554-55, 299 N.E.2d 562.) The prosecutor here did not limit himself to describing the uncontradicted nature of the evidence; instead he commented:
"Ladies and gentlemen, the testimony of the people who have testified here is uncontroverted, uncontradicted. You have heard absolutely no one tell you anything else."
The defense did present one witness, and however inefficient this attempted impeachment was, it was presented to contradict and controvert Weems' testimony concerning his description. The prohibited statement in People v. Wollenberg (1967), 37 Ill.2d 480, 229 N.E.2d 490 ("No one else testified. Let's get that straight"), is so similar to that presented in the instant case as to be undistinguishable. The State argues that the surrounding circumstances of the argument distinguish the two instances. In Wollenberg the prosecutor listed the witnesses for the State and the two defense witnesses, then said "No one else testified." Here the *322 prosecutor did not list the witnesses before saying "You heard absolutely no one tell you anything else." Such brinksmanship in closing arguments, which leads to endless appeals and constant debate over the limits of prosecutorial comments, obscures the true dilemma: has the prosecutor suggested to the jury that its attention should be focused on the defendant's failure to take the stand? (See People v. Helm (1973), 9 Ill. App.3d 143, 291 N.E.2d 680.) This comment may well have had such an effect. As stated in People v. Chellew (1968), 104 Ill. App.2d 100, 108-09, 243 N.E.2d 49:
"It is unfortunate that the comment was made. It may well be that it had no effect upon the outcome of the case. As we have indicated, the evidence was sufficient to support the verdict of the jury. However, there is no way we can know that the comment did not affect the result."
Each of defendant's contentions, when examined apart from the others, may not constitute reversible error, but when considered in combination, each complicates and compounds the matter. (People v. Mwathery.) Accordingly, when considered as a whole, we cannot say that such errors were harmless beyond a reasonable doubt or that they did not contribute to the conviction. (Cf. People v. Weathers (1975), 62 Ill.2d 114, 120-21, 338 N.E.2d 880 (conviction reversed for severely prejudicial remarks despite considerable evidence against defendant).) Each of these errors goes most fundamentally to fair trial rights  admission of evidence of other crimes, comments on inadmissible evidence, and comments on defendant's invoking of his right to remain silent. Thus, defendant is entitled to a new trial.
Reversed and remanded.
DOWNING and HARTMAN, JJ., concur.
*323 STOPKA v. LESSER, 82 Ill. App.3d 323 (1980) 402 N.E.2d 781 JOSEPH L. STOPKA, Plaintiff-Appellant, v. NORMAN H. LESSER, Defendant-Appellee. No. 79-41 Illinois Appellate Court  First District (2nd Division) Judgment affirmed. Opinion filed March 18, 1980.
1. MALICIOUS PROSECUTION (§ 1)  essence of action for malicious prosecution. Action for malicious prosecution is brought to recover damages suffered by one against whom suit has been filed maliciously and without probable cause.
2. MALICIOUS PROSECUTION (§ 1)  what necessary to establish special injury for purposes of malicious prosecution action. Element of special injury in malicious prosecution theory of recovery is injury not necessarily resulting in any and all suits prosecuted to recover for like causes of action and includes injury beyond anxiety, loss of time, attorney fees, and necessity for defending one's reputation.
3. MALICIOUS PROSECUTION (§ 36)  plaintiff failed to satisfy special injury requirements for malicious prosecution action. Where party named in medical malpractice action alleged damage to reputation, mental anguish, time lost in defense and increased malpractice insurance premiums, he failed to state sufficient facts to satisfy special injury requirement for malicious prosecution action.
4. MALICIOUS PROSECUTION (§ 1)  at common law person is not liable for bringing action unless he acts maliciously or without probable cause. At common law person is not liable for bringing any suit, criminal or civil, or for causing seizure of property, if court had jurisdiction of subject matter and parties, unless he acts maliciously and without probable cause.
5. COURTS (§ 70)  appellate court may not overrule State Supreme Court or modify its decisions.
APPEAL from the Circuit Court of Cook County; the Hon. DAVID A. CANEL, Judge, presiding.
DeJong, Poltrock & Giampietro (Wayne B. Giampietro, of counsel), for appellant.
Byrne and Schrenk, of Chicago (John M. Barnes, of counsel), for appellee.
Mr. JUSTICE DOWNING delivered the opinion of the court:
Should the special injury requirement in malicious prosecution actions in Illinois continue to be the law in Illinois? That is the overriding issue raised in this appeal from the malicious prosecution and legal malpractice action brought by plaintiff, Joseph L. Stopka (Stopka), against Norman H. Lesser (Lesser). Lesser filed a motion to dismiss the *324 suit for failure to state a cause of action. The principal issue before this court is whether Stopka has alleged sufficient facts to state a claim for relief.[1]
Lesser is a licensed attorney. One of his clients, James Luzzi (Luzzi), suffered an injury for which he received medical treatment at a hospital emergency room. As a result of that treatment Lesser filed, in Luzzi's behalf, a medical malpractice suit against the hospital and a treating physician. Almost five months later, Lesser filed an amended complaint alleging that Stopka, a licensed physician, was guilty of medical negligence. Stopka, an inactive hospital staff member, had no connection with Luzzi's treatment. Seventeen months after he was named as a malpractice defendant, Stopka was dismissed from the action.
Stopka then brought this two-count complaint against Lesser.[2] In count one Stopka alleges that had Lesser consulted hospital records available to him through discovery, he would have known Stopka had no connection with Luzzi's treatment and, thus, he would have known no probable cause existed to sue Stopka. The record discloses no special circumstances attending Lesser's filing of the amended complaint, and the running of the statute of limitations was not imminent. Therefore, Stopka complains Lesser maliciously named Stopka as a medical malpractice defendant and caused him to be damaged in his reputation, to suffer mental anguish, to devote much time to his defense, and to pay increased medical malpractice insurance premiums.
Count two, in addition, states Lesser breached a duty to Stopka, proximately causing the aforesaid damages, and therefore is guilty of legal malpractice.
Lesser filed a motion to dismiss the complaint alleging Stopka failed to state sufficient facts to satisfy the special injury requirement for a malicious prosecution action. He also claimed that count two failed to state a cause of action because Lesser owed no recognized legal duty to Stopka. The trial court granted Lesser's motion and dismissed the action.

I.

A.
Stopka first contends he has alleged sufficient injury to justify recovery from Lesser. He argues that although the traditional definition of special injury may not include the injuries he has suffered, his injuries are *325 equivalent to and should be treated like those suffered by successful claimants in suits sounding in other recognized torts. He also argues that the circumstances of this case require a reassessment of the special injury requirement to malicious prosecution actions in Illinois.
 1 An action for malicious prosecution is brought to recover damages suffered by one against whom a suit has been filed maliciously and without probable cause. (Schwartz v. Schwartz (1937), 366 Ill. 247, 250, 8 N.E.2d 668.) To obtain recovery under the theory of malicious prosecution Illinois courts have traditionally required a suitor to plead and prove the following five elements:
"(1) [T]he institution of civil proceedings by the defendant; (2) termination of such proceedings in favor of plaintiff; (3) want of probable cause for the proceeding; (4) malice on the part of defendant in bringing such proceedings; and (5) special injury to plaintiff as a result of such action." Alswang v. Claybon (1976), 40 Ill. App.3d 147, 150, 351 N.E.2d 285; see generally Bank of Lyons v. Schultz (1980), 78 Ill.2d 235, 239; Schwartz v. Schwartz; Bonney v. King (1903), 201 Ill. 47, 50, 66 N.E. 377; Smith v. Michigan Buggy Co. (1898), 175 Ill. 619, 627, 51 N.E. 569.
 2 The element of special injury has been defined as that "injury not necessarily resulting in any and all suits prosecuted to recover for like causes of action." (Schwartz v. Schwartz (1937), 366 Ill. 247, 250.) Thus, the appellate court has held special injury to be that injury "beyond the anxiety, loss of time, attorney fees, and necessity for defending one's reputation, which are an unfortunate incident of many (if not most) lawsuits." Lyddon v. Shaw (1978), 56 Ill. App.3d 815, 818, 372 N.E.2d 685; see also Madda v. Reliance Insurance Co. (1977), 53 Ill. App.3d 67, 71, 368 N.E.2d 580, appeal denied (1978), 67 Ill.2d 592; see generally Ritchey v. Maksin (1978), 71 Ill.2d 470, 475, 376 N.E.2d 991; 52 Am.Jur.2d Malicious Prosecution § 11 (1970).
 3 The instant count, construed in a light most favorable to Stopka, fails to set forth sufficient facts to meet the criteria stated above. Each of the four injuries alleged by Stopka fall within the "ordinary injury" Illinois courts have expected defendants to suffer as the result of malpractice litigation, whatever its merits. See, e.g., Berlin v. Nathan (1978), 64 Ill. App.3d 940, 946, 381 N.E.2d 1367, appeal denied (1979), 72 Ill.2d 581 (same injuries claimed and rejected as special injuries); accord, Pantone v. Demos (1978), 59 Ill. App.3d 328, 336, 375 N.E.2d 480; Balthazar v. Dowling (1978), 65 Ill. App.3d 824, 826, 382 N.E.2d 1257, appeal denied (1979), 74 Ill.2d 585; Lyddon v. Shaw.

B.
 4 Count two of Stopka's complaint frames his allegations in terms of a *326 traditional negligence action. In T.E. Hill Co. v. Contractors' Supply & Equipment Co. (1911), 249 Ill. 304, 310, 94 N.E. 544, our supreme court stated:
"At common law a person is not liable for bringing any suit, criminal or civil, or for causing a seizure of property, if the court had jurisdiction of the subject matter and the parties, unless he acts maliciously and without probable cause."
The holding in "Hill still represents the state of the law in Illinois. [Citations.]" (Pantone v. Demos (1978), 59 Ill. App.3d 328, 331.) Thus, count two fails to state a cause of action currently recognized in Illinois.

C.
Stopka urges this court to modify our supreme court's prior decisions by expanding the standard of injury sufficient to support an action for wrongful litigation. In support of this argument Stopka contends the present cause of action affords no substantial protection to those who suffer actual damage by the wrongful filing of litigation against them.[3] Furthermore, he argues that public policy considerations which promote access to the courts suggest a liberalization of the requirements for a malicious prosecution action.
 5 It is elementary that it is not within this court's authority to overrule our supreme court or to modify its decisions. (Agricultural Transportation Association v. Carpentier (1953), 2 Ill.2d 19, 27, 116 N.E.2d 863; Belden Manufacturing Co. v. Chicago Threaded Fasteners, Inc. (1967), 84 Ill. App.2d 336, 340, 228 N.E.2d 532, appeal denied (1968), 37 Ill.2d 625.) We are therefore compelled to hold that Stopka's injury allegations fail to satisfy the current special injury requirements. Schwartz v. Schwartz.
Our holding, however, does not mean that we believe the circumstances of this case are equitably resolved. An attorney who files a clearly meritless suit should not be protected.[4] At present, a majority of American jurisdictions do not condition recovery for wrongful litigation *327 upon proof of extraordinary injury.[5] We believe a reassessment of the special damages requirement in this jurisdiction is appropriate. It should result in the establishment of an alternative that would impose a meaningful duty upon attorneys to ascertain whether the said party sued is possibly liable for a wrong committed and, absent any exigency, where that possibility does not exist, to effectively deter[6] meritless litigation by providing a recovery[7] from the attorney to the victim without the requirement of special damages. The alternative need not result in the interminable litigation feared by the court in Smith v. Michigan Buggy Co. (1898), 175 Ill. 619, 629. On the contrary, a modification of the special injury standard may act as a restraint to the fantastic growth of sometimes meritless lawsuits currently burdening our court system. It is evident that the existence of the special injury requirement has not curtailed this growth.
In accordance with the reasons stated above we must affirm the order of the circuit court of Cook County, which dismissed Stopka's complaint for failure to state a cause of action.
Judgment affirmed.
STAMOS and HARTMAN, JJ., concur.
*328 IN RE VILLAGE OF PALOS PARK, 82 Ill. App.3d 328 (1980) 402 N.E.2d 800 In re VILLAGE OF PALOS PARK.  (THE VILLAGE OF PALOS PARK, Petitioner-Appellee, v. JACK PAYAN et al., Respondents-Appellants.) No. 79-1233 Illinois Appellate Court  First District (2nd Division) Judgment affirmed. Opinion filed March 18, 1980.
1. LOCAL IMPROVEMENTS AND ASSESSMENTS (§ 6)  access to existing sewer lines denotes more than proximity. Resident's access to existing sewer lines denotes more than proximity, since it implies unobstructed right to use the adjoining facility and includes right of connection.
2. LOCAL IMPROVEMENTS AND ASSESSMENTS (§ 333)  when court will not interfere with plan of distribution of assessment over various lots. In absence of legal objections demonstrating substantial inequality in plan of distribution of assessment over various lots, courts will not interfere with plan.
3. LOCAL IMPROVEMENTS AND ASSESSMENTS (§ 6)  inclusion of objectors' property in sanitary sewer district was proper. Where considerable implemental work would have to have been performed in order to effect necessary connections between existing sewer and property of residents objecting to assessment for connection, inclusion of objectors' property in sanitary sewer district was proper, equitable and reasonable exercise of village board's discretion.
4. LOCAL IMPROVEMENTS AND ASSESSMENTS (§ 483)  when jury finding on question of benefit will not be disturbed. Basis of assessment is proportionate enhanced market value of property, and reviewing court will not disturb jury finding on question of benefit unless it is clearly and palpably against manifest weight of evidence, therefore, where there was conflicting evidence concerning fair cash value and benefit resulting from sewer system installation, jury finding would not be disturbed.
5. LOCAL IMPROVEMENTS AND ASSESSMENTS (§ 294)  assessment roll is prima facie evidence of correctness of amount assessed. Where assessment roll was submitted showing plan of distribution of cost of sewer system, roll was prima facie evidence of correctness of amount assessed and this presumption was rebuttable by evidence showing that fair cash market value of property before and after improvement would not be enhanced at all or that property would not benefit to extent of amount assessed against it.
6. LOCAL IMPROVEMENTS AND ASSESSMENTS (§ 325)  trial court did not err in failing to reduce special assessment. Fact that certain aspects of improvement contemplated within assessment district by themselves do not directly benefit objectors' properties is insufficient reason for reducing assessments of these parcels if effect of overall improvement adds to values of these parcels in amount equal to assessment and assessment is not more than proportionate shares thereof, thus, proportion is determined not by comparison with cost *329 of certain parts as though they were separate improvements, but by comparison with cost of whole improvement.
APPEAL from the Circuit Court of Cook County; the Hon. MARGARET G. O'MALLEY, Judge, presiding.
Edward G. Vogt, P.C., of Kankakee, for appellants.
McCarthy, Scheurich, Duffy, Neidhart & Snakard, of Chicago (Frank K. Neidhart, Thomas J. Montgomery, and Thomas S. Moore, of counsel), for appellee.
Mr. JUSTICE HARTMAN delivered the opinion of the court:
A special assessment petition filed by the village of Palos Park on April 4, 1978, generated objections from six property owners who were included in a proposed sanitary sewer district in the village. Legal objections filed by the objectors were overruled by the circuit court. They have not been included in the record. Amended benefit objections were filed and tried before a jury pursuant to statute (Ill. Rev. Stat. 1977, ch. 24, par. 9-2-58) on May 7 and 8, 1979, resulting in a verdict in favor of the village of Palos Park, upon which judgment was entered on May 8, 1979. The objectors' post-trial motion was overruled on May 17, 1979, from which order this appeal proceeds. That motion, in two parts, averred, first, that the improvement to objectors' properties is "* * * minimal, disproportionate * * *," and that they were added into the assessment "* * * for the sole reason of minimizing the cost of improvement to the other persons seeking said assessment," for which they sought exclusion from the assessment, and, second, "* * * that the jury was wholly unwarranted in finding that the property of the objectors was assessed in the proportionate share of the cost of the improvement."
The issues presented for review are whether or not the trial court should have sustained the objections and permitted the objectors' disengagement from the special assessment and whether or not the trial court erred in failing to reduce the special assessment attributable to the objectors. We affirm for the reasons which follow.
The assessment roll and report (hereinafter report) filed on August 25, 1978, reveals that the area contained within the assessment district, designated as the Northeast Area Sanitary Sewer, is bounded by 80th Avenue, Brand Avenue, Virgil Avenue and the north side of 120th Street. The report refers to Ordinance No. 1978-1 adopted by the village, and recommendations and estimate of the board of local improvements, the amount assessed against each lot, the names of taxpayers for each such lot *330 and their residences, the amount found to be public benefit and assessed to the municipality and the amount of each assessment. The estimated cost of the improvement was $57,900 which, when spread equally among the 22 property owners whose property would benefit by the improvement, amounted to $2,631.82 to be paid in 10 installments.
Each of the six objectors owned property on 121st Street. The ordinance had attached to it as Exhibit A a plan purporting to show the assessment district and location map. The exhibit reveals an existing sanitary sewer lying within 121st Street, described by the village engineer as a 15" concrete sanitary sewer, previously constructed for the benefit of Palos Hospital. Connecting wyes for future use were built into this existing sewer as a cost to the village and apparently remained as its obligation to Palos Hospital in an amount of $2,700, according to the estimate. At page 2 of the plan the following note appears:
"A 15" SANITARY SEWER WAS INSTALLED IN 121ST STREET BETWEEN 80TH AVENUE AND VIRGIL AVENUE UNDER MSDGC PERMIT NO. 77-109 WHICH INCLUDED 9-15"x6" WYE BRANCHES. THIS CONTRACT INCLUDES THE LOCATION OF THESE WYE BRANCHES AND THE INSTALLATION OF A 6" VCT HOUSE SERVICE FROM EACH WYE BRANCH TO THE PROPERTY LINE AS DIRECTED BY THE ENGINEER."
No direct reference is made to the improvement intended for 121st Street property in the ordinance; however, the following language appears:
"Section 1: A local improvement shall be constructed in the Village of Palos Park consisting of:
* * *
Junctions shall be provided for each recorded lot, whether vacant or occupied. House service risers and laterals shall be installed where shown and noted on the plan."
The objectors called the village engineer, Raymond P. Bliss, under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 60), and also called as their own witnesses Sharon Lentfer, a real estate broker, and Jack Payan, one of the objectors. As their witnesses, the village called William McCann, a real estate appraiser, and a resident and former village functionary, Warren Jacobek. Such aspects of the testimony of these witnesses as are pertinent to the issues on appeal will be discussed in the body of this opinion.
The first point raised by the objectors is that the village is seeking to assess private property for the construction and installation of a sanitary sewer which already exists, abuts the objectors' properties, is connected to the Cook County sanitary sewer system and needs nothing further in order to utilize it for the purpose of carrying sewage. Observing that the *331 cost of this existing sewer is not included in the special assessment except the item of obligation to Palos Hospital, the objectors contend that the direct cost of constructing and installing sewers abutting the properties of the other 16 participants was spread equally among these participants as well as the objectors, the effect being to require the objectors to pay in part for new sewer construction and installation to be enjoyed by others. Whether the plan of distribution of cost was equitable or the improvement was necessary are legal questions to be decided by the trial judge, not the jury. (City of Monticello v. LeCrone (1953), 414 Ill. 550, 558, 111 N.E.2d 338; Village of Glencoe v. Jackson (1968), 102 Ill. App.2d 65, 76, 243 N.E.2d 865.) The village asserts that these questions were not so submitted in this case, are not of record, were never ruled upon and must be deemed waived, citing Snow v. Dixon (1977), 66 Ill.2d 443, 362 N.E.2d 1052, and Pennington v. Alexander (1968), 103 Ill. App.2d 145, 242 N.E.2d 788. Objectors rely upon section 9-2-57 of the Illinois Municipal Code (Ill. Rev. Stat. 1977, ch. 24, par. 9-2-57) as authorizing these issues to be considered on appeal because "* * * further controversy as to the remaining question upon the record," the benefit objection, had been pursued, leaving the legal objections available for review. Section 9-2-57 does not relieve an objector from preserving for review those legal objections actually presented to and passed upon by the trial judge, however. Mere reference to them in a post-trial motion without their inclusion in the record on appeal is insufficient.
 1-3 Even had the legal objections been properly preserved for review, the difficulty with objectors' argument is the assumption that they already had "access" to the 121st Street sewer and nothing further was needed to implement their use thereof. "Access" in this context denotes more than mere proximity; it implies the unobstructed right to use an adjoining facility (Cobb v. Commissioners of Lincoln Park (1903), 202 Ill. 427, 67 N.E. 5; Stoner Manufacturing Corp. v. YMCA (1958), 13 Ill.2d 162, 148 N.E.2d 441). An easement of access to a sewer includes the right of connection. (Black's Law Dictionary 28 (4th ed. 1951).) In the present case, as the ordinance, plans, estimate of costs and testimony show, considerable implemental work would have to be performed in order to effect the necessary connections between the existing sewer and the objectors' properties, thereby supporting the plan of cost distribution. For example, 6" vitrified tile lateral sewers are to be installed in the street leading from wyes in the existing sewer in 121st Street to the private property line of each objector, from, 12' to 14' distant, where they then become accessible for purposes of tapping into the system and its utilization. According to the testimony of the village engineer, Bliss, to accomplish tap-in for the properties, some lateral sewers on 121st Street would have to go under the street and others would not. Trenching, *332 excavating, trench-backing with stone fill in paved areas, replacement of sodding, replacement of bituminous concrete for street and driveway crossings, as well as engineering and inspections, would all be required in order to effectuate use of the existing 15" sewer line. Such circumstances were not present in the inapposite cases cited by objectors, including Sheedy v. City of Chicago (1906), 221 Ill. 111, 77 N.E. 539; McFarlane v. City of Chicago (1900), 185 Ill. 242, 57 N.E. 12; City of Highland Park v. Edward Hines Lumber Co. (1970), 130 Ill. App.2d 664, 265 N.E.2d 408; or Village of Glencoe v. Jackson (1968), 102 Ill. App.2d 65, 243 N.E.2d 865. In the absence of legal objections demonstrating substantial inequality in the plan of distribution of the assessment over the various lots, as in this case, courts will not interfere with the plan. (City of Batavia v. Wiley (1930), 342 Ill. 384, 391, 174 N.E. 553.) The inclusion of objectors' property in the sanitary sewer district in the case at bar has not been shown to be other than a proper, equitable and reasonable exercise of the village board's discretion. In re Special Assessment (1977), 46 Ill. App.3d 772, 361 N.E.2d 290.
With respect to their benefit objection, it is maintained that if the minimal expenditure required in constructing the lateral sewers was the only basis of the cost of improvement attributable to them, no objections would have been made,[1] but the village has enmeshed these items of cost with construction of a new main sewer intended to serve other properties with benefits wholly foreign to objectors. They consider this situation sufficient upon which to require that the cause be remanded to the trial court for reallocation of costs with respect to them, which they estimate to be 10 percent of the total cost of construction in contrast with the 27 percent they are being assessed. They point to the report and map of the proposed improvement in which larger sized lots or groupings of lots were assessed no more than smaller groupings; persons were omitted from the assessment roll although their properties were benefited; and refer to an ordinance adopted while the cause was pending establishing a $3,000 sewer tap-in fee in lieu of the original $200 charge. Acknowledging that a special assessment will not be modified by the courts unless it is clearly inequitable, unjust or so improper as to amount to a fraud, citing City of Highland Park v. Edward Hines Lumber Co. (1970), 130 Ill. App.2d 664, 665-66, objectors claim such circumstances exist in this case.
 4, 5 The basis of an assessment is the proportionate enhanced market value of the property (People ex rel. Drobnick v. City of Waukegan (1953), 1 Ill.2d 456, 462, 116 N.E.2d 365; People ex rel. Smith v. Brewer Estate (1935), 362 Ill. 88, 91, 199 N.E. 109), and a reviewing court will not *333 disturb a jury finding on the question of benefit unless it is clearly and palpably against the manifest weight of such evidence. (Village of Glen Ellyn v. Lami (1973), 10 Ill. App.3d 243, 293 N.E.2d 478; see also City of Chicago v. Marsh (1911), 250 Ill. 512, 514, 95 N.E. 473.) The assessment roll submitted in the instant case was prima facie evidence of the correctness of the amount assessed. (Village of Northbrook v. Steerup (1959), 16 Ill.2d 530, 158 N.E.2d 630.) This presumption is rebuttable by evidence showing that the fair cash market value of the property before and after the improvement would not be enhanced at all or that the property would not benefit to the extent of the amount assessed against it. The fact that some lots possessed a greater area or frontage than others is not controlling, although such fact can be considered in determining benefits. (City of East Peoria v. Mavis (1973), 15 Ill. App.3d 357, 360, 304 N.E.2d 496.) The evidence adduced from the witnesses in the present case reveals testimony for the objectors of a real estate broker, Lentfer, who stated that in her opinion the six homes would not be worth one penny more whether there were served by a septic system or by a sewer system.[2] Contrasted with this testimony, McCann, a professional real estate appraiser, testified for the village that each property in the assessment area, including objectors', would benefit from the utilization of a sewer system in an amount in excess of $2,600. The conflicting evidence concerning fair cash market value and benefit was a question to be resolved by a jury; their verdict that the objectors' properties would indeed proportionately benefit was clearly supported by the record and cannot be disturbed by this court on review. City of Monticello v. LeCrone (1953), 414 Ill. 550, 556-57; Pedrick v. Peoria & Eastern R.R. Co. (1967), 37 Ill.2d 494, 229 N.E.2d 504.
 6 Assessments are not limited to the cost of materials used for the construction of an improvement as it affects each parcel individually. The fact that certain aspects of the improvement contemplated within the assessment district by themselves do not directly benefit objectors' properties is an insufficient reason for reducing the assessments of these parcels if the effect of the overall improvements adds to the values of these parcels in an amount equal to the assessment and the assessment is not more than the proportionate shares thereof. (Ill. Rev. Stat. 1977, ch. 24, pars. 9-2-45, 9-2-58; City of Chicago v. Farwell (1918), 284 Ill. 491, 502-03, 120 N.E. 520.) The proportion is determined not by comparison with the cost of certain parts as though they were separate improvements, but by comparison with the cost of the whole improvement. 284 Ill. 491, 503.
With respect to the argument relating to the increased fee assessed by the village for those property owners seeking to tap into the existing *334 sewer system, the presumption of its validity was neither challenged nor ruled upon by the trial court and is not properly before us on appeal. The change in fee might be inferentially construed as manifesting a legislative intent to rectify those inequitable situations in which property owners who decline to participate in special assessment districts later seek the benefits from utilizing the existing system at a relatively negligible cost to them by virtue of the substantial payments earlier required of the actual participants.
For the foregoing reasons the order from which this appeal is taken must be affirmed.
Affirmed.
PERLIN, P.J., and DOWNING, J., concur.
NOTES
[1] Also pending before this court is Lesser's motion to dismiss this appeal on the ground that it raises no meritorious issues of law. The instant appeal arises from a genuine controversy involving concrete questions of law. This court has jurisdiction to hear the appeal. We believe the circumstances of this case merit discussion. Therefore, we deny Lesser's motion for dismissal.
[2] Stopka originally named Luzzi as a codefendant, but that action is not before this court.
[3] In support of Stopka's contention, his brief contains a table showing the final resolution of malicious prosecution lawsuits brought to trial in Illinois since 1848. Of the 191 cases tried. Stopka claims the plaintiff has been successful in only eight actions arising out of an underlying civil suit. As of this date, not one action has been terminated in a plaintiff's favor since 1934.
[4] The current protection afforded attorneys by the Illinois special injury requirement grew from the original concern that every citizen have unfettered access to the courts to claim what he deems to be his right. (Smith v. Michigan Buggy Co. (1898), 175 Ill. 619, 628; see generally Lyddon v. Shaw (1978), 56 Ill. App.3d 815, 821-22.) That concern is not offended by a requirement that attorneys investigate whether a possibility of recovery exists. The obvious failure to so investigate in this case should not be protected. The judicial system should not set up and maintain such an inequitable, artificial standard which can permit unprincipled attorneys to file meritless lawsuits.
[5] Our research reveals 23 jurisdictions do not currently require special injury, while 17 States, including Illinois, do require such a showing. See O'Toole v. Franklin (1977), 279 Ore. 513, 518, 569 P.2d 561, 564, and cases collected therein.
[6] In Berlin v. Nathan (1978), 64 Ill. App.3d 940, 950, it was suggested that a defendant to a meritless lawsuit had the following effective remedies: (1) an action against the plaintiff in the prior suit for either malicious prosecution, or (2) abuse of process; (3) recovery of attorneys' fees by motion under section 41 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 41); and (4) involvement in the institution of disciplinary proceedings against the offending attorney. None of these "remedies" would be effective in remedying the inequities presented by the facts of this case.
[7] Article I, section 12 of the Illinois Constitution of 1970 provides as follows:

"Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation. He shall obtain justice by law, freely, completely and promptly."
[1] The objectors submitted three sets of figures which they maintain reflect alternate methods of assessing against them the actual cost involved in the project attributable to each of their properties, namely, $946.56, $1,133, and $1,679.81.
[2] On oral argument, counsel for objectors conceded the lack of merit in this testimony.