THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAIMIE RODRIGUEZ, Defendant-Appellant.

First District (5th Division)   No. 82—1607

Opinion filed December 16, 1983.—Rehearing denied February 3, 1984.

Steven Clark and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Bruce A. Cardello, and Louis F. Stalzer, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE WILSON delivered the opinion of the court:

Following a jury trial, defendant was found guilty of burglary (Ill.

Rev. Stat. 1981, ch. 38, par. 19—1) and sentenced to an extended term of 10 years. On appeal, defendant contends that: (1) the trial court erred in denying his motion for a continuance predicated on the sudden death of his 14-year-old daughter; (2) the State injected improper and prejudicial evidence which suggested that defendant had committed prior crimes; and (3) the State's improper comments during closing argument prejudiced defendant's right to a fair trial. For the reasons stated below, we affirm the judgment of the trial court.

Defendant was charged with the burglary of Midwest Wire Specialties Co., Inc. (MWS), Chicago, during which a quantity of blank payroll checks was taken. Pursuant to the record, the parties first appeared before the trial court on March 3, 1982, and after seven continuances, were scheduled to commence jury selection on May 24, 1982. On that date, defendant presented a motion *in limine* requesting a one-week continuance on the ground that he was suffering from extreme mental distress as the result of his daughter's death from cancer the previous day, and, as a result, his ability to make trial strategy decisions, such as jury selection, was extremely impaired. In response, the court stated that accommodations would be made for defendant to attend the wake and funeral. However, the motion for continuance was denied on the grounds that (1) the illness was not sudden; (2) defendant knew that his daughter had cancer, thus, had time to prepare himself mentally for this eventuality; (3) defendant failed to present any evidence to establish that people are physically or mentally incapacitated as a result of such a tragic event; and (4) defendant failed to prove that to proceed would prejudice his right to a fair trial.

Thereafter, John Radzak, MWS plant manager, testified that upon arriving at the plant on November 13, 1981, approximately 6:45 a.m. he noticed that one of the plywood panels had been knocked out of the rear garage lift door, leaving an opening approximately two feet wide. Inside the plant, Radzak noticed that the main office door was hanging by one hinge and the lock was pulled out, all of the plywood on the office side was ripped out of the wall, desk and cabinet drawers throughout the offices were ransacked, and the washroom and closet doors were open. He immediately notified the police about the break-in, but did not report anything stolen as nothing appeared to have been taken.

Radzak further stated that MWS employs approximately 35 people, all of whom he knows. To his knowledge, defendant was never employed at MWS. Radzak then identified several obsolete MWS payroll checks which the company had stopped using in December 1980,

but he did not recognize the signature on any of them. Further, Radzak did not recognize the photo identification card purportedly issued by MWS and stated that MWS has never issued employee identification cards of any kind.

On cross-examination, Radzak stated that until the president of MWS told him on November 13 that some blank obsolete payroll checks had been removed from a cardboard box that she kept in a closet outside her office, he did not know such checks even existed. Radzak had never seen defendant on the MWS premises and did not see defendant take the payroll checks.

Next, Marion Sitkiewicz, president of MWS, testified that when she arrived at the plant on November 13, 1981, she was told that there had been a burglary, but that nothing had been taken. At that point, she asked if anyone had checked the box of blank obsolete payroll checks which were on the shelf in the coat closet. The checks were packaged chronologically in plastic-wrapped bundles of 50. As she looked through the checks, Sitkiewicz noticed that a series of 250 checks were missing from the middle of the box. After calling the bank to stop payment, Sitkiewicz called the police, informed them about the missing checks and gave them the check numbers. From approximately two weeks following the burglary until the beginning of February 1982, Sitkiewicz received approximately 30 calls from angry local business people. Others came to MWS in person, complaining about stop-payment checks they had received. Sitkiewicz then identified the checks from the missing series, stating that the dollar-amount stamp used on the front of the checks was different from that which had been used by MWS. Further, the signature on the checks was not that of Radzak which it purported to be. In fact, Radzak had never had authority to sign payroll checks. Sitkiewicz also confirmed that MWS has never issued employee identification cards or printed caps.

On cross-examination, Sitkiewicz stated that in addition to herself, only the bookkeeper would have known about the existence of the blank payroll checks. When the checks arrived from the printer, the numbers were verified to be certain none were missing. The box which contained the checks had only the number sequence written on it and had been on the closet shelf since December 1980. The closet does not lock and is accessible to anyone who is working in the main office. Sitkiewicz had never seen defendant on the MWS premises and did not see him take the checks. On redirect, Sitkiewicz stated that, prior to November 13, 1981, she had never received complaints from local businessmen about payroll checks from the missing series.

Fred Lauback, evidence technician for the Chicago police depart-

ment, testified that because of the pervasive oil-smoke mist which covered virtually every surface in the MWS plant and offices, he was unable to procure any fingerprints.

Next, John Iberle, manager of New Division Pulaski Currency Exchange (the Exchange), Chicago, testified that on November 28, 1981, defendant attempted to cash an MWS payroll check, made out to Jaimie Rodriguez. For identification, defendant gave Iberle his Illinois driver's license and social security card. Because Iberle had never cashed an MWS payroll check, he telephoned a currency exchange located near MWS to verify the company's existence and also checked the serial number against the "fraud card" issued by the Currency Exchange Association. When he noticed that the serial number on the check presented by defendant was one of those reported stolen, he dialed the police and locked the front door via an electrical switch in his office. While he was trying to get through to the police, another customer tried to enter the Exchange, but could not because the door was locked. Iberle told defendant to tell the other customer that the Exchange was closed and continued trying to reach the police. Suddenly, Iberle heard loud noises from the front of the Exchange and saw defendant kicking out the glass panel on the door. At that point, Iberle unlocked the door, but defendant escaped through the kicked-out panel anyway. When the police arrived, Iberle gave them the MWS payroll check plus defendant's driver's license and social security card.

Rosie Ramos, cashier at Balaban Furniture Store, Chicago, testified that on December 6, 1981, approximately 6 p.m., defendant purchased a television set on layaway, using a MWS payroll check for down payment and receiving change from the transaction. For identification, defendant gave Ramos a photo employee identification card purportedly from MWS. The picture on the card was of defendant. On December 8, approximately 6 p.m., defendant returned to make another payment on the television set. Again, he made the payment with a payroll check from MWS, showed his identification card and received change. Two days later, approximately 8:30 p.m., defendant, wearing a white painter's hat with the MWS name on the front, returned to make his final payment. This time, however, because Ramos had been informed by the store's bank that defendant's payroll checks were bogus, she summoned the police and told the sales manager to keep defendant busy until they arrived. At trial, Ramos identified the two MWS payroll checks that she had cashed and identified the photo identification card as depicting defendant.

Next, Victor Rivera, Chicago police officer, testified that when he

arrested defendant at Balaban Furniture Store on December 10, 1981, he found an MWS payroll check in defendant's right sock. Rivera then identified the check he had removed from defendant's sock and identified defendant as the person he had arrested.

David Wechsler, owner of two retail clothing stores in Chicago, testified that on December 24, 1981, defendant purchased approximately $100 worth of clothing from one of his stores with an MWS payroll check from which he received change. Wechsler then identified defendant as the purchaser and identified the check he had used to pay for his purchases. Several days later, Wechsler received a similar check from his bank, marked "stop payment," which had been used to pay for purchases at his other store. When Wechsler called MWS, he was referred to detective Culbertson who later showed Wechsler a photo array from which Wechsler recognized defendant.

Next, Detective Lawrence Culbertson of the Chicago police department testified that when Wechsler showed him the bogus MWS payroll check, he recognized it as one taken during a burglary at the MWS plant in November. Based on Wechsler's description of the customer and information on file regarding the attempted MWS check cashing at the New Division Pulaski Currency Exchange, Culbertson showed Wechsler 12 photographs of "white Hispanics" from which Wechsler identified defendant. There was a number, but no name, on the front of each photograph. On January 19, 1982, Culbertson obtained a warrant for defendant's arrest for forgery.

Next, Gus Kardaras, owner of T & C Meat Market, Inc., Chicago, testified that on January 22, 1982, defendant attempted to pay for his groceries with a payroll check, using an MWS employee card for identification. The photograph on the card matched the customer's face. While Kardaras was attempting to verify the telephone number which appeared on the check, defendant left the store, leaving his identification card behind. Because of the unusual circumstances, Kardaras called the police and later gave them the payroll check and the identification card. At trial, Kardaras identified the check and the identification card as those presented to him by defendant.

Next, Detective Joseph Mohan of the Chicago police department testified that he became aware of the MWS burglary during one of his routine checks of the clipboard located at headquarters which contains information regarding crimes committed in the area. As a detail man, it is Mohan's function to watch the clipboard for any crime patterns and pursue those that develop. On January 25, 1982, Mohan noticed a supplementary report to the original MWS burglary which indicated that a person by the name of Jaimie Rodriguez was known to have

possession of MWS payroll checks. Mohan then ran a computer check on Rodriguez to see if he had any outstanding warrants from which Mohan could obtain an address. On February 3, 1982, after a nine-day search, Mohan located defendant, placed him under arrest and took him to police headquarters where he was interviewed by Mohan in the presence of Mohan's partner. When Mohan asked defendant how he came into possession of the payroll checks, defendant admitted that he had broken into a wire factory located in Chicago by kicking in a door panel on the overhead rear door and had taken a handful of checks from the factory offices. As a result of his admission, defendant was charged with burglary. On cross-examination, Mohan stated that no court reporter was present during the confession, no one attempted to get a written statement and Mohan did not take notes during the interview.

After the State rested its case, defendant moved for a mistrial based on: (1) Culbertson's prejudicial testimony; (2) the State's improper reference to defendant's silence; and (3) the State's characterization of defendant as a burglar and its verbal attacks on defense counsel's integrity. The motion was denied. Defendant then rested his case. Subsequently, judgment was entered on the jury's verdict, all post-trial relief was denied and defendant was sentenced to an extended term of 10 years' imprisonment. Defendant's timely appeal followed.

OPINION

■■ We shall first address the issue as to whether the trial court erred in denying defendant's motion for continuance. The granting or denial of a request for additional time is a matter to be determined after a careful examination of the particular facts and circumstances surrounding the request (*People v. Rivera* (1978), 64 Ill. App. 3d 49, 52, 380 N.E.2d 1018, 1020-21), and is addressed to the sound discretion of the trial court (Ill. Rev. Stat. 1981, ch. 38, par. 114—4(e)), whose disposition will not be disturbed absent a showing of prejudice. *People v. Thibudeaux* (1981), 98 Ill. App. 3d 1105, 1113, 424 N.E.2d 1178.

In the case at bar, the trial court expressed its sympathy to defendant regarding his daughter's death and stated that defendant would be granted the necessary time to attend the wake and funeral. However, because no evidence had been presented to establish prejudice to defendant or to establish that people in such a tragic situation are incapacitated from movement or from thinking to the extent that they would be considered incompetent to stand trial, the motion was

denied. Defendant argues that news of his daughter's death impaired his judgment to the extent that his input during the "difficult jury-selection decisions" was adversely affected. We find no merit in this argument. First, defendant fails to indicate how the composition of the jury would have differed had he been in a "normal" frame of mind. Second, defense counsel was given 10 challenges which, according to the record, do not appear to have been exhausted. Certainly if inclusion of a bank "embezzlement officer" and a security investigator appeared to be detrimental in any way to defendant's position, defense counsel would have exercised his challenges. To suggest that defendant, a lay person, could select a more appropriate jury than could an experienced attorney is untenable. During oral argument, defense counsel even admitted that counsel, not the defendant, has the final decision regarding a tendered jury. Thus, because defendant's allegation of prejudice is grounded on pure conjecture with no evidence of actual prejudice having been shown, it is our view that the trial court's denial of the motion for continuance was proper.

In this regard, we find defendant's reliance on *People v. Lott* (1977), 66 Ill. 2d 290, 362 N.E.2d 312, to be misplaced. In *Lott*, the State presented a surprise rebuttal witness who testified that defendant had admitted to him in the presence of others that he had committed the armed robbery for which he was on trial. Defense counsel's request for a continuance to locate the witnesses to the alleged admission was denied. The supreme court affirmed the appellate court's reversal of the circuit court on the ground "that the denial of a continuance, on the grounds of surprise, to procure surrebuttal witnesses prejudiced the accused's opportunity to adequately defend." (66 Ill. 2d 290, 300.) By contrast, in the present case, the denial of a continuance did not violate defendant's substantive right to properly defend.

■■ Next, defendant contends that he was denied the right to a fair trial by the admission of evidence of other crimes or other acts of misconduct committed by him. Specifically, defendant cites four instances of allegedly prejudicial testimony: (1) Detective Culbertson's statement that when shown defendant's driver's license at the currency exchange, he recognized defendant's photograph; (2) photographs shown by Culbertson to Wechsler for identification purposes on January 8, 1982, had numbers on them; (3) Detective Culbertson's comment that the photographs shown to Wechsler were of "white hispanic gentlemen that have had contact with the police department;" and (4) Detective Mohan's statement that, through a computer check, he had found outstanding warrants against defendant.

First, we find nothing prejudicial about either Culbertson's recog-

nition of defendant's photograph or the occurrence of numbers on the photographs. Detective Culbertson's statement which indicated that he had seen defendant previously did not necessarily imply a criminal record. (*People v. Rogers* (1940), 375 Ill. 54, 59, 30 N.E.2d 77.) There are any number of innocent ways in which they could have had contact. Further, the numbers on the photographs could have been merely sequential numbers for purposes of numerical order, *i.e.*, one through 12. There is nothing in the record indicating that they were police numbers. When a question to that effect was raised, it went unanswered. Moreover, we concur with the trial court that neither instance was elaborated upon or highlighted in any way. "They were [merely] small things that were brought out," none of which rose to the level of reversible error.

█ Further, we do not find Detective Culbertson's statement that the photos shown to Wechsler were of "white hispanic gentlemen that have had contact with the police department" to have prejudiced defendant. By the time Culbertson showed the photo array to Wechsler on January 8, 1982, defendant had been arrested for deceptive practices as the result of the Balaban Furniture Store incident. Testimony to this effect had been elicited during the examination of Officers Manshreck and Rivera, both of whom testified prior to Culbertson. Thus, the fact that the individuals (including defendant) in the photo array were described as having had previous contact with the police did not inform the jury of anything it had not already learned through prior testimony. Accordingly, we conclude that Culbertson's comments did not prejudice defendant's right to a fair trial. Further, because defendant failed to include Detective Mohan's reference to warrants as error in his motion for new trial, he has waived that issue for review. *People v. Thomas* (1983), 116 Ill. App. 3d 216, 221, 452 N.E.2d 77.

█ Finally, we find *People v. Stover* (1982), 89 Ill. 2d 189, 432 N.E.2d 262, upon which defendant relies, unpersuasive of his position. In *Stover*, the supreme court held that the prosecutor's inquiry into defendant's previous acquaintance with the arresting officer was error because there was no reason for the inquiry other than to imply prior criminal activity. As discussed, the comments objected to in the present case were either innocent of any criminal implication or suggested only that which had already been put into evidence.

█ Next, defendant contends that he was denied a fair trial due to allegedly improper comments made by the prosecution during closing argument. First, relying on *People v. Connors* (1980), 82 Ill. App. 3d 312, 402 N.E.2d 773, defendant claims that the prosecution's re-

peated comments that testimony by State witnesses was unimpeached and uncontroverted constituted reversible error. In *Connors*, the prosecutor did not limit himself to commenting on the uncontradicted nature of the evidence. He also stated that no one had testified to the contrary, ignoring the fact that defense counsel had produced one witness. Consequently, the court held that error had been committed because the prosecutor's comment was in contradiction to the evidence. We find *Connors* factually distinguishable from the case at bar and adhere to the well-settled legal tenet that comment upon the uncontradicted nature of testimony is a permissible summary of the evidence, and is not tantamount to a comment upon defendant's failure to testify. (*People v. Cobb* (1981), 97 Ill. App. 3d 615, 618, 422 N.E.2d 1106.) Accordingly, we find no error or unfair prejudice in the prosecutor's remark.

■ Defendant further assigns as error the prosecutor's reference to defendant's alias and his repeated verbal attacks on defense counsel's integrity. Regarding the alias, defendant argues that because there was no testimony as to an alias, it was not a proper subject for closing argument. Preliminarily, we note that although no testimony regarding the use of alias names was given at trial, reference to defendant's use of an alias appears on two arrest reports which are made a part of the record. Although the record is not clear as to whether these reports were submitted to the jury, whether they were or not is academic in light of the fact that defendant's objections to the mention of an alias and also to the alleged personal attacks against defense counsel were promptly sustained by the trial court, and the prosecution was reprimanded by the trial court for those alleged attacks, thereby curing any error which may have occurred. *People v. Cobb* (1981), 97 Ill. App. 3d 615, 618, 422 N.E.2d 1106.

■ Defendant also argues that the prosecution's remarks concerning the lack of fingerprint evidence were improper. While it is true that the defense did not "harp on fingerprints" in its argument, testimony regarding lack of fingerprints was brought out at trial. Thus, the prosecution is entitled to argue that evidence and any reasonable inferences derived therefrom. *People v. Hicks* (1981), 101 Ill. App. 3d 238, 242, 427 N.E.2d 1328.

■ Finally, defendant argues that because "the evidence was actually close and conflicting *** as to the charge of burglary," the prosecutor's improper arguments unfairly "tipped the scales." Our conclusion that the prosecutor's comments were either not improper or, if improper, were promptly cured by the trial court, obviates the need to discuss this allegation except to state that, in our opinion, the

evidence overwhelmingly supported the jury's verdict. Accordingly, we affirm the judgment of the circuit court of Cook County.

Affirmed.

LORENZ and MEJDA, JJ., concur.