THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
EDGAR LOUIS ORTIZ *et al.*, Defendants-Appellants.

First District (6th Division)   Nos. 1—87—3687, 1—88—2517 cons.

Opinion filed December 7, 1990.—Rehearing denied February 5, 1991.

Jeffrey Urdangen and Andrea M. Lubelfeld, both of Chicago, for appellants.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Following separate bench trials, defendants, Angel Torres and Edgar Luis Ortiz, each were found guilty of murder, aggravated kidnapping, and armed robbery. They each were sentenced to concurrent prison terms of 70 years, 30 years, and 15 years, respectively.

In their consolidated appeal, defendants contend that they were not proved guilty of murder beyond a reasonable doubt. Ortiz also contends that he was deprived of effective assistance of counsel; that alibi witnesses were improperly impeached; and that the State improperly introduced evidence of other crimes in connection with the Ortiz arrest.

The pertinent facts are as follows. Iris Rosario, age 23, testified that on October 7, 1986, at approximately 11 p.m., she was with her sister Raquel, age 12, Gustavo Trevino, and defendants. They were watching television and getting high at Torres' house. Iris stated that Ortiz was extremely upset about the killing of his brother, Gilberto, who had been shot to death that evening. Iris was Trevino's girlfriend.

Iris testified further that around 11:30 p.m., defendants and

Trevino left for about an hour and returned with three guns: an Uzi submachine gun, a .38 caliber gun, and a .25 caliber gun, and began cleaning bullets with grain alcohol. According to Iris, defendants said they were going to hunt for Disciple gang members because they had killed Gilberto. Iris also testified that Torres was a chief in the War Lords and that Ortiz and Trevino were members of that gang. Iris stated that defendants and Trevino invited her and Raquel to cruise around with them because the police would not stop or search them if the girls were in the car.

Iris and Raquel rode in the front seat of the car driven by Torres, with Ortiz and Trevino in the back seat, to the Disciples' neighborhood. They cruised around for at least an hour, until they saw a man dressed in beige pants, a black jacket and a black and white Playboy hat. The man was later identified as the victim, William Agron. Torres pulled the car over and asked Agron if he had some joints. Agron replied that he did and told them to wait while he went inside the house.

Iris testified further that when Agron emerged from the house, Torres got out of the car carrying his .25 caliber gun, opened the back door, and forced Agron into the back seat of the car. Torres then drove back to their neighborhood, during which time Ortiz and Trevino searched Agron's pockets and took some joints and his wallet. Ortiz and Trevino then searched Agron's body for tattoos that would indicate he was a member of the Disciples, but found none. Iris learned that the man's name was William and that he was from Puerto Rico.

Iris testified that defendants decided to kill Agron. After returning to the neighborhood, Torres drove to the alley. At that point, defendants took Agron from the back seat and into the alley.

Trevino drove Iris and Raquel back to the girls' house, approximately two or three houses from the alley. Iris stated that Trevino and Raquel remained in front of the house, while she walked back towards the alley where defendants and Agron were standing. She saw defendants shoot at Agron; Agron tried to run away from them and towards her. Defendants continued shooting and chased Agron, who eventually collapsed between a light pole and a garbage can in the alley. Defendants then returned to their car and drove away. Later that day, Torres threatened to kill anybody who spoke to the police about the killing of Agron. (Trevino was also charged in connection with this murder; however, his case was severed and he is not involved in this appeal.) Raquel also testified for the State and corroborated the testimony of Iris.

Officer Tolemo testified that on October 8, 1986, at approximately 4:30 a.m., he responded to a call that there were "shots fired" at 1913 West Potomac in Chicago. Tolemo and his partner drove to the alley behind that location, where they discovered the body of a man near a light pole and next to a garbage can, in beige pants and a black jacket, with a black and white Playboy hat near his head. The parties stipulated that Dr. Nancy Jones, the medical examiner, concluded that Agron died as a result of multiple gunshot wounds. Two of the bullets recovered from his body were fired from a .25 caliber gun, while the other two bullets were fired from either a .357 or a .38 caliber gun.

Flavio Ortiz, who had known defendants since grammar school, also testified for the State. (Flavio did not admit any knowledge to the police about Agron's death until he and his wife were arrested for possession of a controlled substance, around October 24, 1986.) On October 8, 1986, Flavio went to Ortiz' apartment to give him a haircut. Ortiz stated that on the previous evening, in retaliation for his brother's death, he drove to an area frequented by the Disciples with Torres, Trevino, Raquel and Iris. Flavio testified that Ortiz told him that after they found a man in that neighborhood, they forced him into the car, drove to an alley, and that he and Torres both shot him. Flavio testified further that later in the day he was with Torres, who told him that he would kill anyone, including the 12-year-old girl, if they told the police about Agron's murder.

Iris Rosario testified that during October 1986, she was using $400 to $500 worth of cocaine per day. She had been using cocaine on the evening of Agron's death. Iris testified that she used cocaine over the past four years. Similarly, there is evidence in the record that Raquel also had a history of drug use.

On October 24, 1986, Iris was taken into police custody for questioning about the murder. When she was first questioned, she admitted her involvement as well as that of Torres in the murder; however, her fear of Ortiz prevented her from disclosing his identity. Iris testified that later that day, Officer Paulnitsky threatened that he would take her children away if she did not reveal the identity of the second man involved in the murder. At that point, Iris told them of Ortiz' involvement. After five days in police custody, Iris also told police that her boyfriend, Trevino, and Raquel were also present on the night of the murder.

On February 2, 1987, Iris gave a statement to Investigator Schwartz, in which she denied that defendants murdered Agron; instead, she stated that she had lied before the grand jury because she

was afraid that Paulnitsky would take her children away from her. On July 21, 1987, after testifying at a pretrial hearing on July 10, Iris again denied that defendants had killed Agron or intimidated her and stated that she had identified the defendants only because the police had threatened to take her children. At trial, however, Iris testified that her denial of defendants' involvement in the murder on July 21 was the result of threats Torres had made to her while she was walking to her mother's house.

On February 12, 1987, Schwartz also took a statement from Raquel concerning her version of the events on the evening of the murder. In that statement, Raquel did not mention the car ride with defendants, Trevino and Iris. Instead, Raquel stated that she was at home on the evening of the murder with Trevino and the defendants, who did not leave until 3:30 a.m. Raquel also told Schwartz that neither defendant carried any weapons that evening and that she had learned about Agron's murder through rumor. Raquel testified further that she did not tell Schwartz the truth because she did not know for whom he was working and that she was afraid that Torres would hurt her or a member of her family.

Iris and Raquel had been relocated for their protection by the State three months prior to trial. Although both girls denied ever returning to their neighborhood during that period, the defense introduced witnesses who stated that they had seen them at their mother's house during that time.

Dr. Henry Lahmeyer, a physician and psychiatrist at the University of Illinois, testified for the defense as an expert witness in the field of drug abuse. Dr. Lahmeyer testified that a cocaine addict's ability to tell the truth is reduced and that cocaine usage can produce mental confusion as well as memory distortion. After reviewing police reports and taped interviews of Iris Rosario, Dr. Lahmeyer opined that she was addicted to cocaine.

Several alibi witnesses testified on behalf of defendants. Jane Ortiz, the woman with whom Torres was living, testified that on October 7 Torres went out for a few beers with friends, but returned home around midnight and did not leave the house again that evening. Several members of Ortiz' family, including his mother, sister, brother, and cousin, testified that on the evening of October 7, he was with them at his mother's apartment mourning the death of Gilberto.

In their appeal, defendants initially contend that they were not proved guilty of murder beyond a reasonable doubt. Specifically, defendants contend that because Iris and Raquel Rosario were drug addicts and accomplices to the murder, their testimony provided an in-

sufficient basis for conviction.

■■ While uncorroborated testimony of an accomplice can be a sufficient ground upon which the trier of fact may base a conviction, it is testimony that must be cautiously scrutinized on appeal. (*People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070; *People v. Pittman* (1973), 55 Ill. 2d 39, 302 N.E.2d 7.) Moreover, where a witness has hopes of reward from the prosecution, that testimony should not be accepted unless it carries with it an absolute conviction of its truth. *People v. Gnat* (1988), 166 Ill. App. 3d 107, 519 N.E.2d 497.

■■ The trial court considered defense counsel's arguments that Iris and Raquel were accomplices and that their testimony should be given little or no weight. Nevertheless, the court found their testimony credible as to the details of the homicide. It is well settled that in a bench trial it is the function of the trial court to determine the credibility of the witnesses and the weight to be accorded their testimony, to resolve inconsistencies and conflicts therein, and to render its decision accordingly. (*People v. Shore* (1984), 129 Ill. App. 3d 443, 472 N.E.2d 512, citing *People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649.) A reviewing court will not substitute its judgment for that of the trial court on these matters, nor will we reverse a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to leave a reasonable doubt of defendant's guilt. *People v. Kline* (1982), 92 Ill. 2d 490, 442 N.E.2d 154.

■■ ■ The State asserts that Iris and Raquel were not accomplices, but even assuming that they were accomplices, we find sufficient evidence to support the trial court's judgment. Iris' description of the events surrounding Agron's murder is corroborated by the physical evidence, particularly the number and caliber of guns used by defendants, the location of the victim's body between the light pole and the garbage can, as well as her testimony concerning the victim's name and description of his clothing. The testimony of Flavio Ortiz and Raquel also supports Iris' description of the circumstances surrounding Agron's murder.

Torres also contends that the trial court's reliance on the testimony of Iris and Raquel was misplaced because they were using drugs on a regular basis at the time of the murder. Torres points to the inconsistencies between the initial statements Iris and Raquel made to Investigator Schwartz and their trial testimony as evidence of their inability to be truthful and that drug addiction negatively affects an individual's ability to perceive and recall events.

This court has consistently held that while a narcotics addict's testimony is suspect, it does not have to be disbelieved, especially when

it is corroborated by other witnesses. (*People v. Smith* (1968), 41 Ill. 2d 158, 242 N.E.2d 198.) Although there is a need for close scrutiny of such testimony (*People v. Galloway* (1974), 59 Ill. 2d 158, 319 N.E.2d 498), it may be sufficient to sustain the conviction if it is credible under the surrounding circumstances. (*People v. Norman* (1963), 28 Ill. 2d 77, 190 N.E.2d 819; *People v. Taylor* (1977), 53 Ill. App. 3d 241, 368 N.E.2d 699.) In this case, the record reveals that the court was cognizant of the witnesses' drug history and assessed the credibility of the witnesses with proper scrutiny. We find that both defendants were proved guilty of murder beyond a reasonable doubt.

Ortiz contends that certain trial errors deprived him of a fair trial. He initially maintains that he was denied his sixth amendment right to effective assistance of counsel. Ortiz points out that his defense counsel utilized prior inconsistent statements made by Iris and Raquel for impeachment, but he failed to direct the trial court to consider the prior inconsistent statements as substantive evidence.

We find the contention to be without merit. In order to prevail under a claim of ineffective assistance of counsel, a defendant must prove two elements: (1) that his attorney failed to perform as a reasonably competent attorney, and (2) there exists a reasonable probability that, but for counsel's unprofessional errors, the outcome of the trial would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.

In this case, Ortiz admits that defense counsel properly impeached Iris and Raquel with their inconsistent statements given to Investigator Schwartz prior to trial. We do not find that defense counsel's failure to specifically notify the judge that these statements could be used as substantive evidence would have produced a different result at trial, as required by the second element of the *Strickland* standard.

Next, Ortiz contends that he was denied a fair trial by the impeachment of the alibi witnesses concerning their failure to notify the police of Ortiz' innocence. Ortiz also claims that the trial court's restriction on the rehabilitation of Torres' alibi witness on redirect examination was improper.

Although the alibi witnesses learned of defendants' arrest at different times, ranging from a few days to several months later, they did not contact the authorities. Under cross-examination, all of the alibi witnesses were questioned regarding their failure to come forward and notify the police of the defendants' innocence. On redirect examination of Jane Ortiz, an alibi witness for Torres, the trial court sustained the State's objection to defense counsel's attempt to have her explain her failure to come forward with the alibi prior to trial.

■■ ■ This court has consistently held that the scope and extent of cross-examination rest primarily within the discretion of the trial court, and only when clearly abused, resulting in manifest prejudice to the complaining party, will a reviewing court interfere with the trial court's ruling. (*People v. Outlaw* (1979), 75 Ill. App. 3d 626, 645, 394 N.E.2d 541, 555, citing *People v. Ganci* (1978), 57 Ill. App. 3d 234, 240, 372 N.E.2d 1077.) Moreover, it is proper to allow the State to cross-examine a witness about the circumstances of an alibi to determine whether the alibi was recently fabricated and whether the witness previously told the same story. (*People v. Green* (1990), 204 Ill. App. 3d 461, 465.) We recognize the difficulties involved for a witness to contact the authorities about an accused's innocence. Nevertheless, we believe that particularly here, where the alibi witnesses were members of Ortiz' family, it was proper to cross-examine them about their failure to inform the authorities of Ortiz' alibi.

■■ Ortiz also maintains that the trial court erred in not permitting defense counsel on redirect examination to ask Jane Ortiz, an alibi witness for Torres, to explain her failure to notify the authorities of Torres' alibi. We believe Ortiz was not prejudiced by the restrictions placed on a Torres witness. We agree, however, that on redirect examination defense counsel should have been permitted to rehabilitate the previous testimony of the alibi witness. Nevertheless, in this bench trial, the error was harmless.

Ortiz finally contends that the admission of evidence concerning his arrest denied him due process. He argues that the evidence had no probative value other than to show his predisposition to violence.

Officer Diego Flores testified that when he and his partner knocked on Ortiz' apartment door to arrest him, Ortiz opened the door with a gun in his hand. When Flores ordered Ortiz to drop the gun, he obeyed and stated, "I thought you guys were the D's." (Disciples.)

■■ An accused is entitled to have his guilt or innocence determined solely with reference to the crime with which he is charged. (*People v. Connors* (1980), 82 Ill. App. 3d 312, 402 N.E.2d 773.) Evidence of other crimes is admissible only if it is relevant to establish any fact material to the prosecution such as knowledge, intent, motive, design or identification. *People v. Stewart* (1984), 105 Ill. 2d 22, 473 N.E.2d 840.

■■ In this case, the trial court properly permitted introduction of narrative evidence of the arrest, not to establish Ortiz' propensity to commit crime, but as relevant circumstantial evidence pertaining to Ortiz' implication in Agron's murder. Ortiz threatened the police with

a gun in the mistaken belief they were Disciples. Ortiz killed Agron because he thought that Agron was a Disciple, and he believed the Disciples had killed his brother. Because the evidence concerning his arrest connected him to the murder, it was properly admitted.

For the foregoing reasons, the judgments of the circuit court of Cook County are affirmed.

Judgments affirmed.

EGAN and RAKOWSKI, JJ., concur.