THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN LACKLAND, Defendant-Appellant.

First District (1st Division) No. 1—89—2986

Opinion filed June 7, 1993.

Michael J. Pelletier and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Barbara Jones, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Following a jury trial, defendant John Lackland was found guilty of armed robbery and was sentenced to 10 years' imprisonment. Defendant appeals his conviction on the grounds that the circuit court erred in denying defendant's motion for substitution of judge pursuant to section 114—5(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 114—5(a) (now 725 ILCS 5/114—5(a) (West (1992))) and in barring defendant from impeaching a witness with prior statements. Defendant also argues that the State made improper closing argument regarding defendant's silence after being

read his *Miranda* rights. We reverse and remand this cause for a new trial.

On June 16, 1987, at approximately 7 a.m., an armed robber held up a cashier at the McDonald's restaurant located at 7601 South Vincennes, Chicago. On December 3, 1987, defendant went into the above McDonald's and bought a cup of coffee, at which time a cashier identified defendant as the June 16 armed robber. The police were called, defendant was arrested and charged with armed robbery.

Prior to trial, this cause was assigned to Judge Philip Carey at the Markham, Illinois, courthouse. Judge Carey ordered that defendant undergo a behavior clinic examination to determine his fitness for trial. On October 31, 1988, the public defender reported to Judge Carey that an initial report revealed that defendant was unfit for trial and probably insane. The second behavior clinic examination found that defendant was fit to stand trial, but made no finding as to defendant's sanity. Judge Carey, therefore, ordered another examination of defendant to determine sanity and continued the cause until December 7, 1988. On December 7, defendant failed to appear in court. The court was informed that defendant was in the Tinley Park Mental Hospital. Before continuing the cause again, Judge Carey noted for the record that he had received a report from the Psychiatric Institute stating that an examination of defendant had been performed by Dr. Albert Stipes. In Stipes' opinion, defendant was unfit for trial but would be fit for trial within a year if sent to a hospital and treated with medication. Judge Carey continued the cause until December 14, 1988.

On December 14, the public defender advised Judge Carey that defendant had been admitted to the Tinley Park Mental Hospital on December 7, but had been subsequently transferred to a facility at 520 North Ridgeway. Then, the public defender recommended that the cause be transferred to the central criminal courts building at 26th and California for a fitness hearing. Judge Carey agreed, stating that the cause would be transferred "to the Chief Judge for a hearing on fitness next week."

On December 22, 1988, the chief judge at 26th and California transferred the cause to Judge Maloney for a fitness hearing. In Judge Maloney's courtroom, the cause was then continued by agreement on January 20 and February 10 and 14, 1989. On March 16, the court was informed that defendant was in Hartgrove Hospital. The following day, the court ordered another examination of defendant, and the cause was continued until April 20, 1989.

On April 20, Judge Maloney advised the parties that Stipes had filed a new report, finding defendant fit for trial with medication and legally sane at the time of the offense. Thereafter, the State noted that a restoration proceeding was necessary in light of the previous findings of unfitness. The court agreed and set the hearing for May 25, 1989.

The restoration hearing was eventually held on June 28, 1989. The parties stipulated that if called, Stipes would testify that he initially examined defendant on November 14, 1988, found defendant unfit to stand trial and that since that time, he has followed defendant's progress. Stipes would further testify that he examined defendant again on April 10, 1989, and found him fit, with medication, to stand trial. Judge Maloney found that upon the stipulated evidence, defendant was fit for trial. Then, defense counsel requested that the case be returned to Judge Carey in Markham. Judge Maloney rejected the above request, stating that "once [the cases] come here they stay here. The only case that were [sic] ever sent back was a violation of probation." Defendant then requested one status date before setting the case for trial. The cause was continued to July 25, 1989.

On July 7, 1989, defendant filed a motion for substitution of judges, pursuant to the Code of Criminal Procedure of 1963, section 114—5(a) (Ill. Rev. Stat. 1987, ch. 38, par. 114—5(a) (now 725 ILCS 5/ 114—5(a) (West 1992))). The motion was argued before Judge Maloney on August 4. Judge Maloney denied the motion, stating that the case was assigned to his courtroom on December 22, 1988, and therefore, the motion was filed "months too late." The cause was set for trial.

At trial, Gloria Hall testified that on June 16, 1987, she was working at the McDonald's at 7601 South Vincennes as a cashier. At about 7 a.m., Hall observed defendant enter the McDonald's and walk around the dining area. Hall asked defendant if she could help him, but he did not respond. Then, defendant entered the work area. She told defendant that he was not permitted to come behind the counter. Defendant ordered her to open the cash register. When Hall hesitated, defendant grabbed her by the arm and put a gun to her head. Hall testified that she looked directly at defendant while he held her. She called for her manager, Mary Ann Pitts, to open the register. When Pitts opened the register, defendant removed the money and put it in a paper bag. Immediately after the robbery, the police were notified. Hall gave police officers a description of the robber and accompanied the officers as they unsuccessfully searched the neighborhood for the offender.

Additionally, Hall testified that on December 3, 1987, at about 5:30 p.m., she was sitting in the dining area of the McDonald's having a meeting, when she saw defendant enter the restaurant, order coffee and sit six feet away from her. Hall informed the manager that she recognized defendant as the armed robber. The police were summoned. When the police arrived, defendant was arrested. Hall identified defendant as the armed robber in a lineup and at trial.

On cross-examination, defense counsel asked Hall if she had ever spoken with investigators from the public defender's office. The State immediately objected and requested a sidebar. During the sidebar, the State informed the court that it did not know to what defense counsel was referring. The State explained that if defense counsel had any memorandum that a statement was made by this witness, it had not received it, and that defense counsel had thereby violated discovery rules. Defense counsel responded that the State did not receive the notes containing Hall's statements because he considered them work product and not proper discovery materials. The circuit court sustained the State's objection and disallowed cross-examination of Hall regarding statements she made to the public defender's private investigator.

Next, Pitts testified that the day of the robbery, she initially observed defendant through a two-way mirror from her office. Then she walked out of her office into the counter area of the restaurant and noticed that defendant was behind the counter. Defendant was holding Hall by the arm when he ordered her to open the register. Pitts also testified that she viewed a lineup during which she stated that she thought defendant looked like the June 16 robber, but that she could not be "one hundred percent sure." Pitts did at trial, however, identify defendant as the robber.

Officer Norris Anderson testified on behalf of the State that he responded to a call on December 3, 1987, at the McDonald's on South Vincennes. Anderson stated that he spoke with Hall, who pointed out defendant as the man who committed the armed robbery on June 16 while holding her at gunpoint. Anderson arrested defendant and read him the *Miranda* rights. At the station, Anderson attempted to elicit the following information from defendant: name, address, height, weight and birth date. Defendant refused to disclose the information. Defendant did, however, eventually give Detective William Higgins the above information.

Assistant State's Attorney Edward Schreiber testified that on December 3, 1987, he interviewed defendant regarding his possible involvement in the June 16 robbery. Schreiber read defendant his

*Miranda* rights, which defendant acknowledged he understood. After a short period, defendant admitted that he was present during the robbery but that he did not do it. Defendant claimed to be a bystander. Schreiber, therefore, asked defendant what he saw during the robbery. Initially, defendant remained silent, until he retracted his earlier statement and claimed that he was not present during the robbery. Defendant refused to make any other comments to Schreiber.

Next, defendant testified on his own behalf, stating that at the time of the robbery, he was living at 77th and Normal, three blocks from the McDonald's. He testified that he never robbed the McDonald's or put a gun to anyone's head. Defendant did recall being arrested at the restaurant and telling Schreiber that he did not know why he was arrested. He further testified that he explained to Schreiber that he was an innocent bystander who had purchased a cup of coffee. Defendant admitted on the witness stand that he told Schreiber that he was present during the robbery. Then, defendant retracted that admission and denied telling anyone he was present during the robbery. Defendant claimed that he asked Schreiber "if I was the one that stuck it up, what would happen, would I do time because I did it or would I get away."

The defense also called Officer Richard Clark as a witness. Clark testified that he went to McDonald's at about 7:20 a.m. the day of the robbery and took Hall's statement. Hall described the robber as a black male, in his 20's, 5 feet 6 inches tall, brown eyes, black hair, dark complected, wearing a blue hat, blue shirt, gray pants and white gym shoes. Clark did not recall whether Hall mentioned that the robber had a goatee or a mustache.

Following closing argument, the jury found defendant guilty of armed robbery. Defendant appeals his conviction.

■ Defendant first contends that the circuit court erred in denying his motion for automatic substitution of judges. (Ill. Rev. Stat. 1987, ch. 38, par. 114—5(a) (now 725 ILCS 5/114—5(a) (West 1992)).) The circuit court's basis for denying the motion was that it was untimely filed. We disagree. Under the applicable statute, a defendant may "10 days after a cause involving only one defendant has been placed on the trial call of a judge" move the court in writing for a substitution of judge or any two judges. (Ill. Rev. Stat. 1987, ch. 38, par. 114—5(a) (now 725 ILCS 5/114—5(a) (West 1992)).) Thus, a defendant has an absolute right to a substitution of judge if the motion is filed within 10 days after the case is placed on the judge's trial call. (*People v. Walker* (1988), 119 Ill. 2d 465, 519 N.E.2d 890.) Additionally, this statute should be construed liberally "to promote rather

than defeat" substitution. *Walker*, 119 Ill. 2d at 471, 519 N.E.2d at 891.

In the case at bar, the circuit court denied defendant's motion for automatic substitution of judges on the ground that the motion was untimely filed. The circuit court reasoned that the case had been placed on its trial call on December 22, 1988, the motion for substitution of judge was filed on July 7, 1989, and therefore, the motion was not filed within the 10-day statutory limit. The circuit court additionally reasoned that defendant was found fit to stand trial and sane at the time of the offense on April 20, 1989. We note that this case was initially on Judge Carey's trial call in Markham, until he transferred it to 26th and California for a *fitness* hearing. The only matter, thus, in front of Judge Maloney was defendant's fitness to stand trial. On April 20, 1989, the Psychiatric Institute filed its opinion that defendant was currently fit to stand trial with Judge Maloney. Judge Maloney did not, however, make a ruling on defendant's fitness until June 28, 1989.

A review of relevant case law reveals that defendant in the instant case was not clear or certain, as required by case law, that Judge Maloney had actually put the case on his trial call. In *People v. Gunning* (1982), 108 Ill. App. 3d 429, 439 N.E.2d 108, which involved a charge of driving under the influence of alcohol, the defendant's motion for substitution of judge was denied on the ground that one particular judge heard all of the traffic cases in that county, and hence, the defendant was on notice that his case would be heard by that judge. Therefore, the defendant had constructive knowledge from the earliest date of his proceedings that he would be tried by that particular judge. The circuit court in *Gunning* consequently held that the defendant, by waiting until the court explicitly stated that it would hear the trial, filed its automatic substitution motion too late. On appeal, the *Gunning* court, citing *People v. Samples* (1982), 107 Ill. App. 3d 523, 437 N.E.2d 1232, held that

> "it is of no consequence that Judge DeLaMar was the judge assigned to traffic matters. Defendant did not know, and could not know, until October 28 that in fact Judge DeLaMar was assigned to his specific case." *Gunning*, 108 Ill. App. 3d at 432, 439 N.E.2d at 110.

In the case at bar, defendant did not know until June 28, 1989, that Judge Maloney had set the case on his trial call. The date at which the automatic substitution statutory time period begins to run, in this case, would have been June 28, 1989. Moreover, defendant was not ruled fit to stand trial by Judge Maloney until June 28, 1989.

Thus, prior to June 28, defendant was not fit to exercise his right under the automatic substitution statute. It is *defendant's* right and responsibility to direct such a motion, not defense counsel's right. We find that defendant's case was not placed on Judge Maloney's trial call until June 28, 1989. Defendant's motion for substitution, therefore, was timely, and the circuit court erred in not granting such substitution. Due to the erroneous denial of defendant's automatic substitution, all proceedings which followed that denial are null and void. (*People v. Thomas* (1978), 58 Ill. App. 3d 460, 374 N.E.2d 795.) Accordingly, we reverse and remand this cause for a new trial.

■ Defendant's second contention is that the circuit court abused its discretion when it precluded defense counsel from impeaching Hall with statements she had allegedly made to an investigator from the public defender's office. The State argues that the circuit court properly precluded such impeachment because defense counsel failed to disclose, in violation of discovery practices, the existence of the statements to the State prior to trial. Since we are remanding this cause for a new trial, it is unnecessary to discuss whether defense counsel's neglect to disclose Hall's statements amounted to a discovery violation, because the State is now aware that the statements exist and can specifically request them prior to the new trial. Therefore, we decline to discuss this moot issue.

Notwithstanding the fact that this cause is remanded for a new trial, we feel compelled to discuss defendant's last contention, that the State violated his due process rights by arguing that he had remained silent and refused to answer questions after receiving the *Miranda* warnings and by arguing that his silence was proof of his guilt, because this issue has the potential to reoccur at the new trial. During closing argument, the State argued:

"Think of [defendant's] actions the night he was arrested. Did he cooperate with the police at that time? He wouldn't tell him his height. He wouldn't tell him his weight. He wouldn't tell him his address. Wouldn't even tell him his name. *If you are innocent, you got nothing to hide.*" (Emphasis added.)

Again, during rebuttal closing argument, the State further commented on defendant's silence by arguing:

"Look at the defendant's behavior, he gets arrested. He wouldn't tell them his name, he wouldn't tell them his address, he wouldn't tell them his date of birth. *That is consciousness of guilty* [*sic*]. Use your common sense. You have to put this together." (Emphasis added.)

The United States Supreme Court has held that the *Miranda* warnings require that a person taken into custody be advised immediately that he has certain rights. Further, the Supreme Court stated:

"Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. [Citation.] Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle v. Ohio* (1976), 426 U.S. 610, 617-18, 49 L. Ed. 2d 91, 97-98, 96 S. Ct. 2240, 2244-45.

■ The State attempts to argue that defendant waived this argument by failing to make a trial objection and include the issue in a written post-trial motion. Although the waiver argument is moot because the cause is being remanded for a new trial, we note that numerous Illinois cases have held that *Doyle* violations constitute "plain error." (*E.g., People v. Nolan* (1987), 152 Ill. App. 3d 260, 504 N.E.2d 205; *People v. Earl* (1980), 89 Ill. App. 3d 980, 412 N.E.2d 645; *People v. Morris* (1979), 79 Ill. App. 3d 318, 398 N.E.2d 38.) In the instant case, defendant remained silent when originally questioned about his name, address, height, weight and birth date. The State used this silence during closing argument as evidence of defendant's guilt.

The State argues that under *Pennsylvania v. Muniz* (1990), 496 U.S. 582, 110 L. Ed. 2d 528, 110 S. Ct. 2638, the questions concerning the above matters fall within the routine booking exception to *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. *Muniz* is distinguishable from the case at bar in two significant respects. First, the defendant in *Muniz* was not advised of his *Miranda* rights prior to being asked "routine booking" questions. Here, defendant was advised of his rights prior to being questioned. Second, the State in *Muniz* was attempting to admit answers the defendant gave to police regarding routine booking information. In the case at bar, the State commented on defendant's *silence* as being evidence of guilt, not on any substantive answers as in *Muniz*. Therefore, *Muniz* is not persuasive under the circumstances in the instant case.

Under *Doyle*, defendant's due process rights were violated by the State's comments in closing argument that defendant's silence after receiving the *Miranda* warnings was "consciousness of guilt." This opinion, therefore, should serve as a caution to the State regarding closing arguments in the new trial.

For the foregoing reasons, we reverse the judgment of the circuit court of Cook County and remand this cause for a new trial.

Reversed and remanded.

MANNING, P.J., and CAMPBELL, J., concur.