THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LONNY HOMES, Defendant-Appellant.

First District (3rd Division)   No. 1—93—0083

Opinion filed August 23, 1995.

Rita A. Fry, Public Defender, of Chicago (Beth I. Solomon and Bruce Landrum, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Sang Won Shim, and James Navarre, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

After a bench trial, defendant, Lonny Homes, was convicted of attempted first-degree murder (720 ILCS 5/8—4, 9—1 (West 1992)), aggravated battery with a firearm (720 ILCS 5/12—4.2 (West 1992)), armed violence (720 ILCS 5/33A—2 (West 1992)), and two counts of aggravated battery (720 ILCS 5/12—4(a) (West 1992)). He was sentenced to nine years' imprisonment.

On appeal, defendant asserts that (1) he was denied his right to a fair trial because the State improperly used the post-arrest silence of a defense witness to impeach that witness' credibility; (2) the State failed to prove that he was guilty beyond a reasonable doubt; (3) his conviction for attempted murder under the theory of transferred intent must be reversed because he was found not guilty of the attempted murder of the alleged intended victim; and (4) the one-act-one-crime doctrine bars judgment and sentencing on all the offenses.

For the following reasons, we affirm in part, reverse in part, vacate in part, and remand in part.

On March 20, 1992, at 5:10 p.m., 14-year-old Tinesha Moore was the victim of a drive-by shooting. Ms. Moore testified that she was walking home from Rico's, a store located at the corner of Dorchester Avenue and 70th Street in Chicago, while it was still daylight. She saw a gray four-door Chevrolet stop on 70th Street near the intersection, then saw a silver gun sticking out of the driver's side window. There were two people in the car. One was in the driver's seat and the other in the front passenger's seat. Ms. Moore tried to run, but she was shot in her left buttock, the bullet exiting her stomach. She was in the hospital for 12 days following the shooting.

Chicago police officer Jacqueline Talley testified that she arrived at the scene around 5:15 p.m. on March 20, 1992. Ms. Moore was lying on the ground about 12 feet from the corner with a gunshot wound in her left buttock. After speaking with witnesses and determining that the shooter's name was "Lonnie," Officer Talley went to the police station to speak to defendant's brother, Corey Homes, who was in custody as a suspect in the shooting. She then arrested defendant at his home.

Glenn Florence, 16, testified that he was walking on 70th Street toward Rico's at 5:10 p.m. on March 20, 1992, when he saw a gray four-door Chevrolet stop at the corner of 70th Street and Dorchester Avenue. Defendant was driving and Corey Homes was sitting in the front passenger seat. At that time, Florence had known defendant and Corey for about a year.

Florence was about 30 feet from the car when the shooting occurred. He saw defendant point a small chrome automatic weapon toward the pay phones outside Rico's and fire four shots from the driver's side window before driving away. After the shooting, Florence went to the pay phones where he saw Timothy Shelly and Ms. Moore on the ground. Florence stated that he told the police officers at the scene that defendant was the shooter, and later that night, he identified defendant in a lineup at the police station.

Timothy Shelly testified that on March 14, 1992, he was at a

roller skating rink at 87th Street and Greenwood Avenue in Chicago where he and his friends got into a fight with defendant, defendant's brother, and their friends. Defendant told Shelly that he was going to "kick [Shelly's] ass," and Shelly responded that defendant was not "going to kick shit."

On March 20, 1992, around 5 p.m., Shelly was standing at the corner of 70th Street and Harper Avenue with a friend. Defendant drove to within 10 feet of Shelly. He was driving a gray four-door Chevrolet and his brother, Corey Homes, was in the passenger seat. After defendant stopped the car, he asked Shelly, "[W]hat is up?" and then told him, "[W]e are going to get you." After Shelly responded, "[C]ome on and get me; you got one chance," defendant drove away. At that time, Shelly had known defendant and Corey Homes for about eight months.

Ten minutes later, while it was still daylight, Shelly was speaking on a pay phone outside Rico's. When the gray four-door Chevrolet stopped at the corner of 70th Street and Dorchester Avenue, a friend of Shelly's called out, "Tim, get down." As Shelly ducked down, a shot rang out. Shelly heard a second shot and saw Ms. Moore fall to the ground. Shelly grabbed Ms. Moore, covered her up, and looked up to see defendant getting out of the car. He saw another person in the car, but could not see his or her face.

Shelly testified that defendant was pointing a nickel-plated gun at the pay phones where Shelly was on the ground. According to Shelly, defendant was shooting at him and no one else on the street corner. After defendant fired two more shots, he got back into the car and drove away.

After the State rested its case, defendant's brother, Corey Homes, 15, testified that he was alone in a white Chevrolet at 69th Street and Dorchester Avenue sometime around noon or 2 p.m. on March 20, 1992, when he fired shots from the passenger side window. He stated that he was shooting at "some boys" whose names he did not remember and did not see Ms. Moore on the corner when he shot her. At the time of the shooting, Corey was 5 feet tall and weighed 80 pounds.

On cross-examination, Corey Homes testified that he was arrested for the shooting and questioned at the police station. While in custody, he learned that defendant had also been arrested for the shooting, but he did not tell the police officers that defendant was not involved. In April 1992, Corey pleaded guilty in juvenile court to discharging a firearm in the direction of another person.

Mia Pinkney, defendant's girl friend, testified that she was with defendant on the afternoon of March 20, 1992. Ms. Pinkney, 15, stated

that she had been staying with defendant and his aunt since March 19, 1992. Defendant arrived home around noon on March 20, 1992, and did not leave until the police arrested him. After defendant's arrest, Ms. Pinkney went to the police station with his aunt. There, she was not questioned by the police and did not tell them that defendant had been with her at the time of the shooting.

Defendant testified that he never left his home on the morning of March 20, 1992. He stated that Ms. Pinkney was not at his house that morning, but arrived later in the day. In the afternoon, defendant went onto his front porch because a locksmith was at the door. According to defendant, he had waited all afternoon for the locksmith, who stayed until shortly before the police arrived.

Defendant stated that he was 5 feet 4 inches tall and weighed 130 pounds on the day of the shooting. Defendant denied being at 69th Street and Dorchester Avenue or 70th Street and Harper Avenue on March 20, 1992; having a dispute with Shelly; shooting anyone; telling the police that he had left his home around 10:30 a.m. to get food and have his hair done; or telling the police that he returned home at 12:30 p.m. and did not leave until he was arrested at 6:35 p.m.

Defendant further testified that the police came to his home because Corey was in custody. Since his parents were not there, defendant volunteered to go to the police station. According to defendant, he did not realize that he was being arrested until he arrived at the police station and was handcuffed.

Finally, there was a stipulation that Detectives Ward and Kelly and Assistant State's Attorney Loque-Rosales would testify that they spoke with defendant at the police station after he was arrested at his home at 6:35 p.m. After being advised of his *Miranda* rights, defendant told them that after getting up at 9 a.m. on March 20, 1992, he left his home at 10:30 a.m. to get some food and then went to get his hair done.

After closing arguments, the trial court found that defendant, not Corey Homes, had fired the gun. Defendant was found guilty of the attempted first-degree murder of Tinesha Moore, the aggravated battery with a firearm of Tinesha Moore, armed violence based on great bodily harm to Tinesha Moore, and aggravated battery based on bodily harm done on the public way. Defendant was found not guilty of the attempted first-degree murder of Timothy Shelly, unlawful use of weapons, and aggravated battery of Timothy Shelly. Defendant was sentenced to nine years' imprisonment.

The first issue on appeal is whether the trial court erred in allowing the State to impeach Corey Homes with his post-arrest silence and to argue his silence in its closing argument.

Initially, the State asserts that defendant waived this issue because he did not object at trial. The State argues that the plain error rule does not apply because there was no fundamental right involved and the evidence was not closely balanced.

In response, defendant contends that this issue should be considered under the plain error rule because courts have generally reviewed violations of *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, under the plain error analysis (*People v. Lackland* (1993), 248 Ill. App. 3d 426, 434, 618 N.E.2d 508) and the evidence is closely balanced. The State argues that *Lackland* (248 Ill. App. 3d 426, 618 N.E.2d 508) is inapplicable because there was no *Doyle* violation in this case.

Even though failure to object at trial and raise the issue in the written post-trial motion generally constitutes waiver (*People v. Nitz* (1991), 143 Ill. 2d 82, 108, 572 N.E.2d 895; *People v. Enoch* (1988), 122 Ill. 2d 176, 188, 522 N.E.2d 1124), the plain error rule can be invoked in instances where the evidence is closely balanced or where the error involves the defendant's substantial rights. (*People v. Martin* (1988), 119 Ill. 2d 453, 458, 519 N.E.2d 884.) In order to determine whether a *Doyle* constitutional violation occurred, we will examine this issue.

Defendant combines his arguments that Corey Homes' post-arrest silence violates *United States v. Hale* (1975), 422 U.S. 171, 45 L. Ed. 2d 99, 95 S. Ct. 2133, which was based on general evidentiary principles, and *Doyle* (426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240), which was based on Federal constitutional rights.

Defendant argues that Corey's failure to tell the police that defendant was not involved in the shooting was not inconsistent with his trial testimony because post-arrest silence is so ambiguous that it is of little probative value. An arrestee may have numerous reasons for failing to inform the police of a fact, including a reliance on his constitutional rights or simple fear. Moreover, defendant declares that there is a difference between a mere witness not coming forward with an alibi for defendant before trial and an arrestee undergoing police interrogation. There is also a difference between someone who remains silent and someone who voluntarily speaks, but omits an important fact. Defendant stresses that the use of his brother's post-arrest silence to impeach his credibility was extremely prejudicial because the trial court relied heavily on the fact that Corey was not a credible witness.

The State responds that its cross-examination of Corey Homes did not violate any constitutional rights because a *Doyle* violation occurs only where a defendant is impeached with his own post-*Miranda* silence after that defendant invokes his right to silence.

■ Using a defendant's post-arrest silence following *Miranda* warnings to impeach his exculpatory story told for the first time at trial violates the fifth and fourteenth amendments. (*Doyle*, 426 U.S. at 617-19, 49 L. Ed. 2d at 97-98, 96 S. Ct. at 2244-45.) When *Miranda* rights are given, the government induces silence by implicitly assuring the accused that his or her silence will not be used against him or her. (*Fletcher v. Weir* (1982), 455 U.S. 603, 606, 71 L. Ed. 2d 490, 494, 102 S. Ct. 1309, 1312.) Due to the accused's reliance on the *Miranda* warnings, any ensuing silence is insolubly ambiguous. (*Doyle*, 426 U.S. at 617-19, 49 L. Ed. 2d at 97-98, 96 S. Ct. at 2244-45.) It may be nothing more than the accused's exercise of his or her *Miranda* rights. *Doyle*, 426 U.S. at 617, 49 L. Ed. 2d at 97, 96 S. Ct. at 2244.

However, where the assurances embodied in the *Miranda* warnings are not given, cross-examination regarding a defendant's post-arrest silence does not violate due process rights. (*Fletcher*, 455 U.S. at 607, 71 L. Ed. 2d at 494, 102 S. Ct. at 1312.) For example, the fifth and fourteenth amendments are not violated by the use of pre-arrest silence to impeach a defendant's credibility because the failure to speak occurs before the defendant is taken into custody and given *Miranda* warnings. (*Jenkins v. Anderson* (1980), 447 U.S. 231, 238-40, 65 L. Ed. 2d 86, 94-95, 100 S. Ct. 2124, 2129-30.) In essence, there would be no government inducement for the defendant to remain silent before his arrest. (*Jenkins*, 447 U.S. at 238-40, 65 L. Ed. 2d at 94-96, 100 S. Ct. at 2129-30.) Similarly, *Doyle* does not apply to a cross-examination regarding actual prior inconsistent statements because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. *Anderson v. Charles* (1980), 447 U.S. 404, 408, 65 L. Ed. 2d 222, 226, 100 S. Ct. 2180, 2182.

Defendant improperly relies on *People v. Beller* (1979), 74 Ill. 2d 514, 521-22, 386 N.E.2d 857, which extended the *Doyle* rule to situations where there is no evidence that the defendant had been given *Miranda* warnings. Three years after *Beller* was decided, the United States Supreme Court held in *Fletcher* (455 U.S. at 607, 71 L. Ed. 2d at 494, 102 S. Ct. at 1312) that there is no due process violation when a defendant is cross-examined regarding his post-arrest silence if *Miranda* warnings had not been given. We must conclude, therefore, that *People v. Beller* (1979), 74 Ill. 2d 514, 521-22, 386 N.E.2d 857, is no longer the law.

■ In this case, there was no *Doyle* violation because defendant was not impeached with his post-arrest silence following *Miranda* warnings. Defendant lacked standing to complain of violations of another person's constitutional rights in that the fifth amendment privilege is personal and cannot be vicariously asserted. *Bellis v. United*

*States* (1974), 417 U.S. 85, 89, 40 L. Ed. 2d 678, 684, 94 S. Ct. 2179, 2183; *People v. Moss* (1977), 54 Ill. App. 3d 769, 774, 370 N.E.2d 89.

Moreover, *Doyle* does not apply because it cannot be presumed that *Miranda* warnings were given to Corey Homes. (*Moss*, 54 Ill. App. 3d at 773.) Without evidence of such warnings, we cannot say that Corey Homes' silence resulted from his reliance on *Miranda* rights. Consequently, we hold that there was no constitutional violation.

Having concluded that use of Corey Homes' post-arrest silence for impeachment purposes was not a constitutional violation, we must consider whether the State's actions violated general evidentiary rules. The threshold question is whether Corey Homes' post-arrest silence was sufficiently inconsistent with his trial testimony to warrant its admission for the purpose of impeachment.

■ Generally, an accused's silence during police interrogation cannot be used for impeachment purposes because it is so ambiguous that it lacks the requisite inconsistency with his later exculpatory testimony at trial. (*Hale*, 422 U.S. at 176, 45 L. Ed. 2d at 104-05, 95 S. Ct. at 2136.) If the State fails to establish a threshold inconsistency between the silence at the police station and the exculpatory testimony at trial, the silence cannot be used for impeachment because it is not probative of a defendant's credibility. (*Hale*, 422 U.S. at 176, 45 L. Ed. 2d at 104-05, 95 S. Ct. at 2136.) The State bears the burden of establishing the threshold inconsistency necessary to admit impeachment evidence. *Hale*, 422 U.S. at 176, 45 L. Ed. 2d at 104, 95 S. Ct. at 2136.

The cases the State relies on are inapposite because they do not involve the post-arrest silence of a witness. (See *People v. Andras* (1992), 241 Ill. App. 3d 28, 608 N.E.2d 310; *People v. Ortiz* (1990), 207 Ill. App. 3d 1, 565 N.E.2d 228.) Although it is appropriate for the prosecution to cross-examine alibi witnesses who are the defendant's friends or family members regarding their failure to come forward and notify the police about the defendant's alibi (*Ortiz*, 207 Ill. App. 3d at 8-9), that principle does not apply to the use of a witness' post-arrest silence as impeachment.

■ We conclude that the State's use of Corey Homes' post-arrest silence as impeachment was improper. Although there was no constitutional violation in using Corey Homes' post-arrest silence, it was not sufficiently inconsistent with his trial testimony to be used as a prior inconsistent statement. Corey Homes' post-arrest silence was so ambiguous that it was error to permit its use on cross-examination. There are many reasons, including a possible reliance on his constitutional privileges, why Corey Homes would not tell the

police that defendant was not involved in the shooting. Furthermore, there is no evidence that he ever confessed to the police or made any statement while in custody.

Nevertheless, the error was harmless because the evidence against defendant was overwhelming in that two eyewitnesses positively identified him as the shooter. Furthermore, the record does not show that the trial court relied heavily on Corey Homes' testimony. The trial court simply stated that it did not believe Corey's testimony and questioned his motivation for admitting in juvenile court that he had discharged a weapon in the direction of other persons. For those reasons, the improper impeachment was not so manifest an error that it deprived defendant of his right to a fair trial.

Next, defendant asserts that the State failed to prove him guilty of being the shooter beyond a reasonable doubt. He declares that the testimony by the prosecution's witnesses was inconsistent whereas his evidence included an unimpeached alibi and an admission by Corey Homes that he was the person who fired the gun.

■ We affirm the trial court's finding that defendant was the shooter. The testimony of a single eyewitness, if positive and credible, is sufficient for a conviction even in the presence of contradictory alibi testimony. (*People v. Hughes* (1994), 259 Ill. App. 3d 172, 177, 632 N.E.2d 251.) The trier of fact is not required to accept the defendant's alibi testimony over a positive identification. (*People v. Louisville* (1992), 241 Ill. App. 3d 772, 776, 609 N.E.2d 682.) Factors to consider to determine whether an identification is reliable are (1) the opportunity the witness had to view the offender at the time of the offense; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the offender; (4) the level of certainty demonstrated by the witness at the identification confrontation; and (5) the length of time between the incident and the identification confrontation. *Neil v. Biggers* (1972), 409 U.S. 188, 199-200, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382; *People v. Slim* (1989), 127 Ill. 2d 302, 307-08, 537 N.E.2d 317.

The trial court considered the credibility of the witnesses and made a decision. In assessing identification testimony, a reviewing court cannot substitute its own judgment for that of the trier of fact on questions involving the credibility of witnesses or the weight of the evidence. (*People v. Jimerson* (1989), 127 Ill. 2d 12, 43, 535 N.E.2d 889; *Hughes*, 259 Ill. App. 3d at 178.) Any conflicts in the testimony are to be resolved by the trier of fact. *People v. Collins* (1985), 106 Ill. 2d 237, 261-62, 478 N.E.2d 267.

■ We find that the State proved that defendant was the shooter

beyond a reasonable doubt. The evidence was not so improbable or unsatisfactory that it created a reasonable doubt of defendant's guilt. (*Jimerson*, 127 Ill. 2d at 43; *Collins*, 106 Ill. 2d at 261.) Two eyewitnesses, Florence and Shelly, positively identified defendant as the shooter; at the time of the shooting, it was daylight; both men knew defendant and his brother; both had ample opportunity to view the shooter; and both gave good, consistent descriptions of the car and the gun.

Furthermore, the testimony by defense witnesses was impeached. Corey Homes testified that he fired the shots sometime around noon or 2 p.m. and portions of defendant's testimony were contradicted by both Pinkney and the stipulation by Detectives Ward and Kelly and Assistant State's Attorney Loque-Rosales.

Next, defendant asserts that his conviction for the attempted murder of Tinesha Moore must be reversed because it was based on the State's theory of transferred intent and the trial court found him not guilty of the attempted murder of Shelly, the intended victim. Defendant contends that those findings are legally inconsistent because there can be no intent to kill Moore if there is no intent to kill Shelly.

In response, the State changes its theory from transferred intent to argue that there was sufficient evidence that defendant intended to kill Moore independently of any intent to kill Shelly. The State argues that the findings of not guilty of the attempted murder of Shelly and guilty of the attempted murder of Moore are legally consistent since the intents were separate and not based on transferred intent. The State contends that by firing his gun in Moore's direction four times, defendant showed malice and total disregard for her life.

The State relies on *People v. Tyler* (1989), 188 Ill. App. 3d 547, 544 N.E.2d 1077, *People v. Starks* (1989), 190 Ill. App. 3d 503, 546 N.E.2d 71, *People v. Wilson* (1991), 224 Ill. App. 3d 364, 586 N.E.2d 547, *People v. Thorns* (1978), 62 Ill. App. 3d 1028, 379 N.E.2d 641, and *People v. Mendez* (1991), 221 Ill. App. 3d 868, 582 N.E.2d 1265, for the proposition that the intent to kill may be inferred from the firing of a gun at another person. However, those cases considered firing a gun at another person as one of several surrounding circumstances.

For a conviction of attempted murder, a specific intent to kill must be proved beyond a reasonable doubt. (*People v. Jones* (1979), 81 Ill. 2d 1, 9, 405 N.E.2d 343; *People v. Harris* (1978), 72 Ill. 2d 16, 27, 377 N.E.2d 28; *People v. Myers* (1980), 83 Ill. App. 3d 1073, 1076, 404 N.E.2d 1082.) The intent to kill is a state of mind that can be proved by the surrounding circumstances, including the character of the assault, the use of a deadly weapon (*People v. Strickland* (1993), 254 Ill.

App. 3d 798, 808, 627 N.E.2d 218), and the firing of a gun at or toward another person with either malice or a total disregard for human life (*People v. Starks* (1989), 190 Ill. App. 3d 503, 510, 546 N.E.2d 71).

■ Transferred intent is where a defendant can be convicted of attempted murder of an unintended victim if he shoots at one person with the intent to kill, but kills or injures an unintended victim. (*People v. Marshall* (1947), 398 Ill. 256, 263, 75 N.E.2d 310; *People v. Migliore* (1988), 170 Ill. App. 3d 581, 589, 525 N.E.2d 182.) Although the intent to kill can be transferred, it must still be proven beyond a reasonable doubt. In this case, defendant was acquitted of the intent to kill his only intended victim. As a result, there was no intent to kill to be transferred.

■ Verdicts that are legally inconsistent cannot stand. (*People v. Hairston* (1970), 46 Ill. 2d 348, 362, 263 N.E.2d 840.) Where one element of an offense (dependent offense) requires proof that a defendant has committed another offense (predicate offense), an acquittal on the predicate offense but conviction on the dependant offense are legally inconsistent verdicts. (*People v. Fiore* (1988), 169 Ill. App. 3d 601, 603, 523 N.E.2d 996.) When that occurs, collateral estoppel requires that the conviction on the dependent offense be reversed. *Fiore*, 169 Ill. App. 3d at 603.

■ At trial, the prosecution's sole theory was that defendant had the specific intent to kill Shelly and shot Ms. Moore by accident. All the testimony elicited by the State at the trial supported that theory. Shelly testified about his ongoing disagreement with defendant and threats defendant had made against him. During the State's closing argument, it argued that defendant went to 70th Street and Dorchester Avenue with the intent to kill Shelly. Furthermore, the State declared during the hearing on defendant's motion for a new trial that its theory was transferred intent.

Now on appeal, the State denies that there was transferred intent and argues that there was sufficient independent evidence that defendant intended to kill Tinesha Moore. The State cannot raise a new theory of the case on appeal. (*People v. McAdrian* (1972), 52 Ill. 2d 250, 252, 287 N.E.2d 688.) Moreover, there was no evidence presented that defendant had the intent to kill Ms. Moore or anyone else besides Shelly. In view of defendant's attempted murder conviction being legally inconsistent with his acquittal for the attempted murder of Shelly and the lack of any evidence of the intent to kill anyone else, we reverse defendant's conviction for the attempted murder of Ms. Moore.

■ Next, defendant asserts, and the State concedes, that the

armed violence and aggravated battery convictions must be vacated under the one-act-one-crime doctrine. (*People v. King* (1977), 66 Ill. 2d 551, 561, 363 N.E.2d 838.) In accordance, we vacate defendant's convictions for armed violence and aggravated battery.

Due to our reversal of defendant's conviction for the attempted first-degree murder of Ms. Moore, we remand this case for resentencing on defendant's conviction for aggravated battery with a firearm, which is a Class X offense that carries a penalty of 6 to 30 years' imprisonment. 730 ILCS 5/5—8—1(a)(3) (West 1992).

Based on the foregoing, we affirm the circuit court's finding that defendant fired the shot that struck the victim; reverse defendant's attempted murder conviction; vacate the armed violence and aggravated battery convictions; and remand this case for resentencing.

Affirmed in part; reversed in part and vacated in part.

GREIMAN, P.J., and TULLY, J., concur.